STATE of Minnesota, Respondent,

v.

James Antino WALKER, Appellant.

No. CX–97–418.

Supreme Court of Minnesota.

Aug. 13, 1998.

S. Mark Vaught, Gregory M. Pennella, St. Paul, for appellant.

Paul R. Scoggin, Asst. Hennepin County Atty., Minneapolis, for respondent.

## OPINION

GILBERT, Justice.

The issue presented in this criminal appeal is whether under the totality of the circumstances an independent investigation by police, instigated by the receipt of an anonymous letter, provided sufficient corroboration of statements in the letter to establish probable cause to make a warrantless felony ar-

rest. The police arrested appellant James Antino Walker without a warrant in February 1996 for the murder of two men. In a search incident to this warrantless arrest, police officers discovered approximately 3.5 grams of crack cocaine in six or seven chunks in Walker's pants pocket. Although Walker was never charged with the two murders that he was arrested for, he was charged with and convicted of third-degree possession of crack cocaine. The court of appeals affirmed in an unpublished decision. Because we conclude that the police did not have probable cause to arrest Walker for murder, the crack cocaine discovered in the search incident to the arrest should have been suppressed as the fruit of an illegal search. Accordingly, we reverse the court of appeals.

Walker first came to the attention of the police on December 13, 1995, when the Golden Valley Police Department received the following verbatim anonymous typewritten letter in the mail stating that Walker was involved in a murder:

*I AM WRITING TO YOU ABOUT THE MURDER OF THE GUY ON THE BICYCLE LAST SUMMER. I CAN,T KEEP QUIET ANYMORE. ITS RUINING MY LIFE. I CANT TELL YOU WHO I AM BECAUSE I WAS THERE I WAS DRIVING THE CAR. BUT I DIDN'T KNOW IT WAS GOING TO HAPPEN.*

*I WAS AT A HOUSE IN PLYMOUTH WITH JAMES WALKER AND LEE CROOKS. LEE OWED JAMES A LOT OF MONEY FOR CRACK THAT HE SMOKED. JAMES WAS TALKING ABOUT ANOTHER DRUG DEALERW WHO NEEDED TO BE KILLED. LEE STARTED TO BRAG ABOUT BEING WILLING TO KILL THE GUY INSTEAD OF PAYING FOR THE CRACK. WE LEFT PLYMOUTH TO GO TO NORTH MPLS FOR MORE CRACK. ON THE WAY WE PASSED THE GUY ON THE BIKE JAMES HANDED LEE A GUN AND TOLD HIM TO PROVE HE WAS MAN ENOUGH TO KILL SOMEONE. JAMES TOLD ME TO TURN AROUND WE PASSED THE GUY AGAIN AND TURNED THE CAR AROUND AGAIN WHEN WE DROVE UP BY THE GUY AGAIN THE GUY STOPPED HIS BIKE AND LEE SHOT*

*HIM. WE DROVE AWAY THEY WERE L AUGHING WE DIDNT KNOW THE GUY DIED TIL LATER.*

*JAMES LIVES IN RICHFIELD ON ABOUT 73 RD AND PORTLAND LEE IS FROM THE MISTIC LAKE RESERVATION IN PRIOR LAKE HIS REAL NAME IS VANCE LEE CROOKS AND HE IS A INDIAN THATS ALL I KNOW.*

The police presumed that the anonymous letter referred to the murder of a man named Loren Bussey. Bussey had been shot and killed by a .40 caliber semiautomatic handgun while riding his bicycle in Golden Valley in August 1995.

In response to the anonymous letter, the Golden Valley Police began investigating the murder allegation with the help of the Hennepin County Sheriff's Office. Detective Michael Spillane, who had 21 years of experience with the Hennepin County Sheriff's Office, was the detective in charge of the murder investigation. Investigators confirmed that both Walker and Crooks were actual persons and that Walker indeed lived near 73rd and Portland in Richfield. At this time, Walker was also under a separate investigation for suspected drug dealing. On December 27, 1995, the police executed a warrant to search Walker's home as a part of the drug investigation. This search warrant is not included in the record, and Walker does not contest its validity. The parties have not provided us with any information as to the basis for or legality of that search and we, therefore, do not address or decide that matter. In the search of Walker's home, the police found a box of .40 caliber bullets, but they did not find a .40 caliber gun. They also found a photo of Walker lying on a bed with an automatic handgun beside him.

The next day, the police interviewed James Bliss, the husband of a woman who was living with Walker. Bliss told police that during the summer of 1995, someone had burglarized his home and stolen many guns, including a .40 caliber Sig Sauer handgun and a 9mm Glock. Bliss said he believed that Walker might have been involved in the burglary. Police showed Bliss the photo of Walker with the automatic handgun that

they had seized in the search of Walker's home. Bliss stated that he believed that the gun in the photo was his stolen 9mm Glock. Detective Spillane testified at the *Rasmussen* hearing, however, that he could not tell from the photo whether the gun beside Walker was a .40 caliber handgun or a 9mm Glock.

Police attempted to trace Bliss's stolen guns in order to link them to Walker. A police firearms examiner determined that the bullet that killed Bussey was "consistent" with having been fired from a .40 caliber Sig Sauer, but the .40 caliber Sig Sauer taken in the Bliss burglary was never recovered. Police learned that another .40 caliber gun taken in the burglary had been impounded in October 1995 when Minneapolis police arrested a man for an unrelated crime. There is no evidence that Walker had any connection with this man.

In the midst of the investigation, on February 7, 1996, police found the body of Daniel Nuss in Golden Valley. Nuss had been shot and killed the previous day. Ballistics analysis revealed that Nuss had been killed by the same .40 caliber semiautomatic handgun that was used to kill Bussey.

At the time police discovered Nuss's body, they had not confirmed any additional information in the anonymous letter. Specifically, the police had not ascertained that anyone mentioned in the letter had participated in the events described in the letter. The police had the letter analyzed for fingerprints, but found no usable prints. Their attempt to determine if the letter was written on a typewriter or on a word processor provided no help in identifying the writer. Nor had the police linked Walker to any of the weapons that Bliss had reported stolen. The only link between Walker and the murder was the anonymous letter but the police also questioned the reliability of the letter. At the *Rasmussen* hearing on December 6, 1996, Detective Spillane was asked on cross-examination if, based on his 21 years of experience as a police officer, he considered the letter to contain truthful information. He testified, "I guess I don't really feel comfortable coming to a conclusion on that * * * * I really can't say."

Nonetheless, on February 8, the day after they discovered Nuss's body, several detectives from the Hennepin County Sheriff's Office, without an arrest warrant, went to Walker's new home in Mound to arrest Walker for the murders of Bussey and Nuss. An unregistered car was parked in Walker's driveway. In an apparent effort to determine whether Walker was at home and then to get Walker out of his home, the detectives asked an officer from the Mound Police Department to ask Walker about the unregistered car. Walker came outside to talk to the Mound police officer about the car. While Walker and the officer were talking, the detectives approached Walker and arrested him in the driveway of his home for the murders of Bussey and Nuss. One of the detectives conducted a search incident to the arrest and discovered in Walker's left front pants pocket a bag containing six or seven rocks of crack cocaine.

After the arrest, the police obtained a search warrant for Walker's house in Mound and searched the house later that day. Even though Walker had been arrested for two murders, the basis for the search warrant focused entirely on narcotics; officers did not list guns or other weapons as items that they were specifically searching for. No weapons were uncovered at the house in Mound, although another .40 caliber bullet was found in the living room. Police did not discover any additional evidence in Walker's house that could potentially connect him to either murder.

Walker was never charged with the murders of Bussey and Nuss nor with the alleged burglary of Bliss's home. On June 19, 1996, however, Walker was charged with third-degree possession of a controlled substance under Minn.Stat. §§ 1152.03; subds. 2(1) and 3(a); 609.101, subd. 3 (Supp.1995) for the crack cocaine found in the search incident to his arrest for murder. At the *Rasmussen* hearing, Walker sought to have the crack cocaine suppressed. He argued that his arrest was illegal because the police did not have probable cause to arrest him for murder and, therefore, the crack was illegally seized. The trial court ruled that the police did have probable cause to arrest Walker for murder and therefore the arrest and the

search incident to the arrest were valid and the crack cocaine was lawfully seized.

At Walker's trial, the state called the Minneapolis city chemist to testify about the substance found in the bag in Walker's pocket. The chemist had tested one of six or seven chunks in the bag and determined that it was crack cocaine. She testified that she had tested only one of the chunks because the chunks were all in a single package and had the same color and texture; her standard practice in this situation was to test only one chunk. She explained that she then weighed all of the chunks in the bag, which had a total weight of 3.5 grams.

The jury convicted Walker of third-degree possession of a controlled substance. He made a motion for a judgment of acquittal or alternatively for a new trial, arguing that the state failed to prove that he possessed the requisite 3.0 grams of crack cocaine. The court denied the motion. The court of appeals affirmed the trial court's admission of the crack cocaine, concluding that it was the fruit of a valid search incident to a lawful arrest. The court of appeals further concluded that the evidence was sufficient to prove that Walker possessed more than 3.0 grams of crack cocaine and therefore sustained Walker's conviction.[1]

Police officers may arrest a felony suspect without an arrest warrant in any public place, including outside a dwelling, provided they have probable cause. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). If an arrest is valid, police may conduct, without a warrant, a full search of the person of the arrestee as an incident of the arrest without any additional justification. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973). Thus, if police had probable cause to arrest Walker, then the search of his person, resulting in the discovery and seizure of the crack cocaine, was lawful as a search incident to arrest and the trial court properly denied the motion to suppress. If, on the other hand, the police did not have probable cause to arrest, then the search was not justified and the trial

court should have suppressed the crack cocaine as evidence directly obtained as a result of an illegal search. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

We deal here with whether police—who knew that two murders had been committed, possibly by the same person and with the same gun—had probable cause to arrest Walker for those murders. The U.S. Supreme Court's latest exposition of the term "probable cause," in *Ornelas v. United States*, discussed probable cause for police to search. The Court stated:

> Articulating precisely what * * * "probable cause" mean[s] is not possible. [It is a] commonsense, nontechnical conception that deal[s] with " 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " As such, the standard [is] "not readily, or even usefully, reduced to a neat set of legal rules." We have described probable cause to search as existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found. We have cautioned that th[is] legal principle [is] not [a] "finely-tuned standard," comparable to the standards of proof beyond a reasonable doubt or of proof by a preponderance of the evidence. [It is] instead [a] fluid concept that take[s][its] substantive content[s] from the particular contexts in which the standard [is] being assessed.

517 U.S. 690, 695–96, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (internal citations omitted). The analysis of the factual and practical considerations that the arresting officers acted on is an objective inquiry; it does not depend on the officers' subjective frame of mind at the time of the arrest. *State v. Speak*, 339 N.W.2d 741, 745 (Minn.1983). When constitutional questions are involved in the analysis, we independently review the facts to determine the reasonableness of the police officers' action. *State v. Olson*, 436 N.W.2d at 94.

---

1. The court of appeals reversed the trial court's sentencing determination and remanded for a correction of Walker's sentence. Walker's sentence is not an issue in this appeal.

The starting point for our probable cause analysis is the anonymous letter. The seminal case involving the use of an anonymous letter as the basis to establish probable cause is the United States Supreme Court decision in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). There, a police department received an unsigned letter stating that Mr. and Mrs. Gates made their living as drug dealers and explaining how they made trips to Florida to acquire drugs:

> Sue his wife drives their car to Florida, where she leaves it to be loaded up with drugs, then Lance flys down and drives it back. Sue flys back after she drops the car off in Florida. May 3 she is driving down there again and Lance will be flying down in a few days to drive it back. At the time Lance drives the car back he has the trunk loaded with over $100,000.00 in drugs.

*Id.* at 225, 103 S.Ct. 2317. After receiving the anonymous letter, the police began an independent investigation to confirm details in the letter. *Id.* The police learned that an "L. Gates" had a reservation to fly to Florida. A federal agent in Florida surveilled L. Gates while he was in Florida and observed him go to a hotel room registered to a Susan Gates. *Id.* at 226, 103 S.Ct. 2317. The next morning, L. Gates and an unidentified woman left the hotel and drove north in a car with Illinois license plates; a check on the license plates revealed that they were assigned to a different car owned by Gates. *Id.* Based on this information, the police sought and obtained a search warrant for the Gateses' home and car. *Id.* The police found 350 pounds of marijuana in the trunk of the Gateses' car. *Id.* at 227, 103 S.Ct. 2317.

The Court upheld the magistrate's finding of probable cause, concluding that under the totality of the circumstances, the letter together with the facts developed from the independent investigation, were sufficient to establish probable cause. The Court reasoned that the letter itself "contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." *Id.* at 245, 103 S.Ct. 2317. The Court also pointed to the importance of "corroboration of detail of an informant's tip by independent police

work," including the corroboration of innocent activity. *Id.* at 241, 243 n. 13, 103 S.Ct. 2317. The extensive police corroboration of the letter's detailed information predicting the Gateses' travel plans made it reasonable, the court concluded, for a magistrate to presume that the writer was familiar with the Gateses' drug activities and had access to reliable information. *Id.* at 245–46, 103 S.Ct. 2317.

Seven years after *Gates*, the Court elaborated on the importance of the reliability of anonymous tips used in justifying police intrusions. *See Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). In *Alabama v. White*, an anonymous phone call was a critical factor in creating reasonable suspicion for a *Terry* stop. In *Alabama v. White*, the Court discussed the relation of the "quality and quantity" of information contained in an anonymous tip to the totality of the circumstances standard of probable cause. "[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable * * * taking into account the facts known to the officers from personal observation, and giving the anonymous tip the weight it deserves in light of its indicia of reliability as established through independent police work". *Id.* at 330, 110 S.Ct. 2412, 110 L.Ed.2d 301.

We have not previously addressed the validity of a probable cause determination stemming from an anonymous letter's report of illegal activity. We have, however, examined generally the use of anonymous tips in light of *Gates*. In *State v. McCloskey*, we upheld a judge's decision to issue a search warrant to search a suspected drug dealer's house. 453 N.W.2d 700 (Minn.1990). The probable cause supporting the warrant was based in part on an anonymous tip. The informant in *McCloskey* walked into the sheriff's office and told the sheriff that he had seen crack cocaine in the defendant's house while he was there purchasing marijuana. *Id.* at 701. The informant refused to give his name but agreed to drive with the sheriff to point out where the defendant lived. *Id.* The informant also gave the sher-

iff the defendant's phone number. *Id.* The sheriff verified that the defendant owned the house and that the phone number was correct. *Id.* In agreeing with the trial court that there was probable cause, we found significant the informant's personal contacts with the police and willingness to actively aid the investigation as well as his statement against interest that he had purchased marijuana from the defendant. *Id.* at 704. Moreover, the police corroborated some of the informant's story before obtaining the warrant. We concluded in *McCloskey* that under the totality of the circumstances the quantity and quality of the information given by the informant and corroborated by the police were sufficient to establish probable cause to support the search warrant. *Id.*

█ The quantity and quality of the suspicious circumstances in this case, however, fall short of establishing probable cause to believe that Walker committed either of the two murders for which he was arrested. We recognize that police officers routinely use anonymous letters as tips to initiate further investigations, but the anonymous letter initiating the investigation of Walker was the only evidence linking Walker to the murders. The letter consisted largely of unsubstantiated hearsay. Although the lower courts gave the anonymous letter considerable weight because the police corroborated Walker's address that was contained in the letter, one's address is an easily ascertainable fact that offers no corroborative evidence to the police. *Cf. Gates,* 462 U.S. at 230–33, 245, 103 S.Ct. 2317. The appellate court also concluded that "the informant did not act out of an attempt to avoid criminal prosecution and the informant also risked retribution from Walker or Crooks." The problem with this conclusion is that it presupposes the reliability of the letter. But the reliability of the letter is precisely what is at issue under the probable cause analysis in this case. Evidence of the letter's reliability is lacking because the police did not corroborate any information in the letter beyond Walker's and Crook's identity and Walker's address. In fact, Detective Spillane candidly admitted on cross examination that he could not say if the letter contained truthful information.

Moreover, unlike the *McCloskey* case, the police here could not identify the letter writer. In *McCloskey,* the informant walked into the sheriff's office and personally aided police in the investigation. Here the police did not know who may have written the incriminating letter.

Furthermore, the independent police investigation did not lead to the quality or range of detailed and corroborative information that was present in *Gates. See Gates,* 462 U.S. at 241, 245, 103 S.Ct. 2317. The police never placed Walker at or near the scene of either murder. However, the police learned the following information about Walker: Bliss believed Walker might have been involved in the burglary of his house when his .40 caliber Sig Sauer handgun and 9mm Glock were stolen; police found a .40 caliber bullet in their search of Walker's home; and ballistics evidence revealed that Bussey and Nuss were both killed by the same .40 caliber gun, which could have been a Sig Sauer. However, neither the murder weapon nor Bliss's Sig Sauer were recovered and therefore was not in any way conclusively linked to Walker. Another .40 caliber gun that was stolen during the burglary of Bliss's home was eventually recovered by police in October 1995 after it was used in a crime by a man with whom Walker had no connection. The murder weapon was never found. The .40 caliber bullets and the photo of Walker with a gun beside him that were found during the December search of his home are inconclusive. They do not provide the strong showing set forth by the United States Supreme Court in *Gates* to overcome the deficiencies in reliability of the anonymous letter. This evidence was properly considered by the trial court, but simply did not link Walker to either murder.

The facts here contrast sharply to the anonymous tips and subsequent investigations examined in *Gates* and *McCloskey.* In *Gates,* the letter contained a detailed prediction of the Gateses' behavior, and independent investigation confirmed that the Gateses made a trip to Florida in almost exactly the manner described in the letter. While the informant in *McCloskey* refused to give his name to the police, he made a statement against his interest in admitting that he had seen cocaine while purchasing marijuana;

presumably the police could have arrested the informant for that illegal act. Moreover, the informant twice personally aided the police in their investigation, and the police were able to corroborate details of the informant's story. Here, the letter did not provide the police with a prediction of future behavior that they were able to use to meaningfully corroborate details of the informant's story. In addition, they did not have the enhanced reliability of an in-person informant like the police did in *McCloskey*. Although the informant in McCloskey remained technically anonymous, he actually assisted the police in their investigation, exposed himself to potential criminal investigation, and gave the police an opportunity to observe him. *See McCloskey*, 453 N.W.2d at 701.

There were suspicious circumstances present in this case, including the .40 caliber bullets found at Walker's home, but mere suspicion without more is insufficient for a warrantless arrest. Under the totality of circumstances presented here, probable cause is lacking. The police had nothing of substance to test the reliability of the informant or to corroborate the details of the informant's tip by independent police work. More than an uncorroborated anonymous letter with a suspect's address is required to establish probable cause to arrest for murder. The unsubstantial, sparse results of the independent investigation added little to the anonymous letter's relatively low degree of reliability. *See Alabama v. White*, 496 U.S. at 330, 110 S.Ct. 2412, 110 L.Ed.2d 301. Without reasonable limitations on the use of such letters in establishing probable cause, any citizen whose address is listed in the phone book could potentially be subject to a warrantless arrest for a felony.

We also point out that despite the fact that the police had sufficient time to apply for an arrest warrant, they did not. At oral argument, counsel for the state admitted that the police most likely failed to do so because they knew they did not have enough evidence to charge Walker with the murders. The arrest of Walker appears spurred by the discovery of another dead body. While the police were inevitably frustrated with the stalled investigation, there were no exigent circumstances compelling the police to arrest Walker where and when they did make the

arrest. Walker's new home in Mound lacked any nexus to either murder and nothing in the record indicates there were additional suspicious circumstances regarding Walker's house at the time of the arrest.

In such a case, the police must continue to use their investigatory skills and resources to first gather and then present sufficient evidence before making an arrest. This includes our preference for obtaining an arrest warrant issued by a detached judge who can make an independent evaluation of the circumstances to determine if they warrant probable cause to arrest. *See, e.g., State v. Olson*, 436 N.W.2d 92, 95–96 (Minn.1989); *State v. Merrill*, 274 N.W.2d 99, 108 (Minn. 1978). The securing of a warrant may tip the scales in doubtful cases. *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). We have previously stated that the reason for this result is to encourage police officers to obtain warrants. *State v. Nolting*, 312 Minn. 449, 254 N.W.2d 340, 345, n. 7 (1977).

■ We conclude that because the police did not have probable cause to arrest Walker for murder, the ensuing search incident to that arrest was not valid. If the police did not have probable cause to arrest Walker for the murders, the subsequent search was improper. *See Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The legality of the arrest is determined based on the information the police took into consideration when making the arrest, not what was uncovered thereafter. A defendant's "arrest is not justified by what the subsequent search discloses." *Henry v. United States*, 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). Consequently, the crack cocaine found in Walker's pants pocket should have been suppressed as the fruit of an illegal search. *See Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *State v. Conaway*, 319 N.W.2d 35, 39 (Minn. 1982).

Because we hold that the crack cocaine found in Walker's pants pocket should have been suppressed, we need not address the

remaining issue of sufficiency of the evidence that led to Walker's conviction.

Reversed.