**STATE of Minnesota, Respondent,**

v.

**Warren Calvin WASSON, petitioner, Appellant.**

**No. C7–99–199.**

Supreme Court of Minnesota.

Aug. 3, 2000.

Mike Hatch, Atty. Gen., Natalie E. Hudson, Asst. Atty. Gen., St. Paul, Earl E. Maus, Cass County Atty., Walker, for respondent.

John M. Stuart, State Public Defender, Theodora Gaitas, Asst. State Public Defender, Minneapolis, for appellant.

## OPINION

RUSSELL A. ANDERSON, Justice.

Appellant was arrested and charged with a controlled substance offense after police executed a nighttime, no-knock search warrant at a residence where appellant was staying. Appellant moved to suppress the fruits of the search warrant on the basis that no circumstances existed to justify a no-knock search. The district court denied the motion, and appellant submitted the case to the court on stipulated facts, resulting in conviction. The court of appeals affirmed the conviction. We granted appellant's petition for review solely on the issue of whether there was a sufficient basis for the unannounced search and now affirm.

Appellant was staying for an indefinite period of time at the home of James Meixner in rural Cass County. This particular house had been the object of a search pursuant to warrant in June 1997, three months previous to the October 1997 search at issue herein. In the June search numerous weapons and drugs were found on the premises.

A confidential reliable informant (CRI) visited Meixner on September 25, 1997. The CRI had previously purchased marijuana and methamphetamines from Meixner, and on this visit observed drug paraphernalia present. The informant told police that Meixner said someone named "Smiley" might have methamphetamines and possibly would stop by on September 27, 1997.

On September 26, 1997, a sheriff's deputy applied for a search warrant for Meixner's property, cars and Meixner himself. The application was based on the information from the CRI. The deputy also stated in the affidavit that he had personal knowledge that Meixner had two previous convictions for possession of controlled substances, including a conviction earlier that year. The deputy specifically requested a no-knock, nighttime entry.[1] The affidavit

---

1. The search warrant application form in this case specifically reserved space for the requesting officer to explain the need for night-time and unannounced searches. Appellant does not claim the affidavit was insufficient because the information regarding weapons

stated that the nighttime search was sought because:

> Your Affiant believes that entering onto the described property could be [sic] affected by law enforcement officers, if done under the cover of darkness, and therefor allowing for the security of property without endangering law enforcement officers or subjects who may be located within the residence or outbuildings. A[p]rior [s]earch [w]arrant was executed on the 27th of June 1997 and numerous weapons were removed [from] the residence.

The affidavit disclosed the unannounced entry was sought because:

> Your Affiant knows that, through experience and training that often persons involved in narcotics trafficking and transactions carry firearms and/or other weapons to protect themselves and to protect their controlled substances. Your Affiant further knows through experience that those involved with controlled substance[s] often attempt to destroy those substances if they should [fear] substances are in [jeopardy] of being confiscated by law enforcement officers.

The deputy testified at the omnibus hearing that most of this language was taken from other search warrant affidavits, and was commonly used in drug-related search warrant applications.

A district court judge signed the warrant application September 26 and it was executed at 9:30 p.m. on October 3, 1997. When executing the warrant the officers parked about a quarter of a mile from Meixner's house. Before entering, they observed Meixner and appellant, whom they did not recognize, sitting across from each other at a coffee table, playing what appeared to be a word game. One of the officers tried the front door, and found it unlocked. The officers, in camouflage, helmets and masks, entered with guns drawn, shouting, "police."

Meixner did not move other than raising his arms above his head. Appellant was startled by the entry, and tossed the dictionary he was holding into the air. He attempted to run out of the room, and did not obey officers' commands to keep his hands where they could be seen and to stand still. Appellant held his fist clenched, and then appeared to shove the contents of his fist down the front of his pants. Officers testified they thought appellant might be hiding a weapon. The officers eventually subdued him. Officers removed a buck knife from appellant's belt and two items containing methamphetamines—an inhaler and a plastic baggie.

Appellant was arrested and charged with fifth-degree controlled substance crime. *See* Minn.Stat. § 152.025, subd. 2(1) (1998). He moved to suppress all the evidence obtained during the execution of the warrant, claiming there was no basis for the unannounced search. At the omnibus hearing it was first revealed that the weapons taken in the June search were ordinary hunting rifles, and had been returned to a relative of Meixner.

The district court denied the motion to suppress, finding the possible presence of guns warranted the unannounced entry. Appellant waived his right to a jury trial and submitted the case on stipulated facts. He was found guilty and the court stayed imposition of his sentence on condition that he serve 90 days in the county jail and five years on probation. The court of appeals affirmed, finding in particular that the possible possession of weapons warranted the unannounced entry.

## I.

■ Important purposes are served by the knock and announce requirement, including preventing the unnecessary destruction of property and mistaken entry into the wrong premises, protecting against unnecessary shock and embarrass-

---

was in the section for reasons for a nighttime entry, which he does not challenge, rather than in the section for reasons for an unannounced entry, which he does challenge.

ment, and decreasing the potential for a violent response. *See State v. Prudhomme,* 287 N.W.2d 386, 389 (Minn.1979). As the United States Supreme Court recently recognized, these values are protected by including in the reasonableness inquiry under the Fourth Amendment an inquiry into the necessity of an unannounced entry. *See Wilson v. Arkansas,* 514 U.S. 927, 934, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995).

 Given the constitutional dimension to the method of entry into a residence, evidence should be suppressed when the circumstances do not warrant an unannounced entry. *See City of Minneapolis v. Cook,* 498 N.W.2d 17, 20 (Minn. 1993) (holding that serious violations that subvert the purpose of established warrant procedures will justify suppression). Where, as here, the material facts are not in dispute, we independently determine whether evidence should have been suppressed as a matter of law. *See State v. Hardy,* 577 N.W.2d 212, 215 (Minn.1998).

 We laid out the principles governing an unannounced entry of a dwelling place in *State v. Lien,* 265 N.W.2d 833, 838–39 (Minn.1978). Relevant to the particular claims appellant makes, we require the police to inform the issuing magistrate of the circumstances that they believe justify the unannounced entry and to obtain specific advance authorization for an unannounced entry. *See id.* at 838.[2]

 To substantiate the need for a no-knock warrant an officer must establish more than that drugs are involved. *See id.* The United States Supreme Court recently held that a blanket exception for the announce requirement in all felony drug cases violates the Fourth Amendment. *See Richards v. Wisconsin,* 520 U.S. 385, 396, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997). In that case the Court reviewed a decision from the Wisconsin Supreme Court holding that exigent circumstances

justifying a no-knock entry are always present in felony drug cases because each case involves a risk of injury to the police and the potential for the disposal of drugs by the occupants prior to entry. *See id.* at 390, 117 S.Ct. 1416. In *Richards,* the Court rejected a blanket rule for all drug cases and required more particularized findings. The Court held that "police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Id.* at 394, 117 S.Ct. 1416.

The Court in *Richards* specifically distinguished the standard for issuance of the warrant itself, probable cause, from the standard for an unannounced entry, which is reasonable suspicion. In describing the reasonable suspicion standard, the Court noted, "[t]his showing is not high, but the police should be required to make it whenever the reasonableness of a no knock entry is challenged." *Id.* at 394–95, 117 S.Ct. 1416. In other contexts this court has defined reasonable suspicion as something more than an unarticulated hunch, that the officer must be able to point to something that objectively supports the suspicion at issue. *See State v. Johnson,* 444 N.W.2d 824, 825–26 (Minn.1989).

 We turn to the affidavit in this case. Appellant is correct that *Richards* makes clear that the admittedly boilerplate language in the search warrant affidavit does not satisfy the requirement for a showing, particular to the search at issue, that announcing would be dangerous or allow the destruction of evidence. However, the search warrant affidavit in this case also pointed to a specific, objective piece of information: that weapons were likely present in the house given that numerous weapons were seized from the exact loca-

---

**2.** In *Lien* we also stated that police may make an unannounced entry without preapproval if

necessary for a safe and successful execution of the warrant. *See* 265 N.W.2d at 838.

tion just three months previously. This information, in combination with the knowledge that since execution of the June warrant Meixner had been willing to facilitate the sale of drugs at his residence to at least the CRI and perhaps others, is more than an unarticulated hunch and objectively supports a reasonable suspicion that knocking and announcing police presence would be dangerous. *See Richards,* 520 U.S. at 394, 117 S.Ct. 1416.

Appellant notes that courts in other jurisdictions have held that the mere presence of firearms is insufficient to make a no-knock entry reasonable. Generally speaking, the cases cited are pre-*Richards* cases. *See, e.g., United States v. Bates,* 84 F.3d 790, 795 (6th Cir.1996); *United States v. Fluker,* 543 F.2d 709, 717 (1976) (holding mere fact that occupant possessed a gun did not justify no-knock entry). In several of the cases appellant cites, the court looked for information that would lead to an *objectively reasonable belief* that the suspect might respond with violence. *See, e.g., United States v. Moore,* 91 F.3d 96, 98 (10th Cir.1996); *United States v. Spinelli,* 848 F.2d 26, 29 (2d Cir.1988). An objectively reasonable belief is a higher standard than a reasonable suspicion, however. *See United States v. Guebara,* 80 F.Supp.2d 1226, 1228 n. 2 (D.Kan.1999). As the *Richards* court noted, the showing required for a reasonable suspicion is "not high." 520 U.S. at 394, 117 S.Ct. 1416. In this case, the officer could point to a particular fact about this particular residence—that coupled with ongoing drug activity numerous weapons were found there three months previously—that led him to suspect that officer safety might be jeopardized. We think that is all *Richards* requires. *See United States v. Cooper,* 168 F.3d 336, 339 (8th Cir.1999) (post-*Richards* case upholding no-knock entry where search warrant did not authorize such, house was likely to contain weapons and

person with known violent tendency was not present).

Many of the other cases appellant cites are also distinguishable on the basis that the officers did not specifically request authorization for an unannounced entry. *See, e.g., United States v. Marts,* 986 F.2d 1216, 1218 (8th Cir.1993); *People v. Condon,* 148 Ill.2d 96, 170 Ill.Dec. 271, 592 N.E.2d 951 (1992). While we need not decide in this case whether to adopt a good faith exception[3] to the knock and announce rule, we have stated, in the probable cause context, that where a search is based on the probable cause determination of a magistrate, rather than a police officer, we may "accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant * * *.'" *State v. Nolting,* 312 Minn. 449, 453, 254 N.W.2d 340, 343 (1977) (quoting *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964)). *See also State v. Walker,* 584 N.W.2d 763, 769 (Minn.1998) (securing of holding that the warrant may tip scales in case of doubtful probable cause). Likewise, in the unannounced search context, we may accept evidence of a threat to officer safety of a less persuasive character when the officer presents the request for a no-knock warrant to a magistrate. In this case the officer followed the instruction we set out in *Lien* to present to a magistrate the particular circumstances justifying an unannounced entry, and the magistrate approved of that method of entry. *See* 265 N.W.2d at 839. The officer's compliance with our direction weighs against excluding the evidence seized.

Finally, in addition to rejecting the appellant's arguments, we disagree with the thrust of the dissent. Although the dissent claims "it is not necessary to defini-

---

**3.** *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (exclusionary rule inapplicable to fruits of search warrant lacking probable cause where officers acted in good faith reliance on search warrant issued by neutral and detached magistrate).

tively prove danger," its analysis suggests just the opposite. The dissent complains of an absence of evidence regarding (1) the type of weapons present, (2) whether suspects have violent or aggressive propensities or history, (3) the severity of the prior convictions of the suspects, (4) whether the suspects were "typically" armed, (5) whether the illegal activity was continuing, and (6) whether the illegal activity would amount to merely use or a sale. If adopted, the dissent's analysis would "mandate a rigid rule of announcement that ignores countervailing law enforcement interests." *Wilson,* 514 U.S. at 934, 115 S.Ct. 1914. This rigid approach was rejected by the United States Supreme Court in *Wilson* and is antithetical to the realities of law enforcement investigative work. *Id.* at 934–36, 115 S.Ct. 1914.

The Court in *Richards* required only a reasonable suspicion, not an airtight case, that knocking and announcing would be dangerous. Like the Court in *Richards,* we also reject boilerplate language to support a no-knock warrant. The dissent's analysis goes far beyond rejecting boilerplate language and, if adopted, would create an unreasonable hurdle for law enforcement officers to safely fulfill their responsibilities.

Accordingly, we hold the officer presented to the magistrate facts that established a reasonable suspicion of a threat to officer safety necessary for an exception to the "knock and announce" requirement of the Fourth Amendment.

## II.

 One of the governing principles of unannounced entries we set out in *Lien* is that even if police obtain advance judicial approval for a no-knock entry, officers should make a "threshold reappraisal of the need to execute the warrant in this manner." *Id.* at 839. Appellant claims that if police had made a good faith reappraisal of the situation, they would have aborted the planned no-knock entry.

The threshold reappraisal principle derives from *State v. Daniels,* 294 Minn. 323, 200 N.W.2d 403 (1972), where we noted that officers "do well either to employ less drastic alternatives or, even though granted a no-knock search warrant, to make a threshold reappraisal of the actual threat of the destruction of evidence. Of course, the last word on this important issue has not been written." 294 Minn. at 336, 200 N.W.2d at 410; *see also Lien* 265 N.W.2d at 836–37. While we have stated that officers "should" make this reappraisal, we have not announced a hard and fast rule that the reappraisal is required in every case.

 We need not write "the last word" today because the officers in this case assessed the need to proceed with an unannounced entry. The district court found the officers in this case made the reappraisal required, a finding of fact that is not clearly erroneous based on the record. *See State v. Buchanan,* 431 N.W.2d 542, 551–52 (Minn.1988) (holding factual determinations on motion to suppress reversed only if clearly erroneous). We independently determine whether what the officers observed demonstrated that an unannounced entry was improper. *See Hardy,* 577 N.W.2d at 215.

The officers observed Meixner, the owner of the weapons, in the residence with an unknown person. While the scene of two people playing a word game did not itself appear threatening, nothing the officers observed contradicted their belief that weapons were present, or provided additional information to suggest there was no threat to officer safety. The officers were not required, based on their threshold reappraisal, to abandon the plan for an unannounced entry.

In sum, pursuant to *Richards,* the state need only show a reasonable suspicion that an announced entry will pose a threat to officer safety. That standard was satisfied here where the officer presented to a magistrate specific information that in addition to ongoing drug activity numerous weap-

ons were present three months earlier at this particular residence when officers executed a search warrant. The officers properly reappraised the need for an unannounced entry, and based on their observations were not required to abandon the plan for that method of entry. The trial court did not err in refusing to suppress the evidence seized.

GILBERT, Justice (dissenting).

I respectfully dissent from the majority opinion, which affirms a no-knock entry into a residence pursuant to a search warrant. This case involves the very important balance between the constitutional guarantee of the expectation of privacy and sanctity of the home in the Fourth Amendment and the serious risk of injury to law enforcement officers in executing search warrants. This balance is ensured by enforcing the Fourth Amendment guarantees of reasonableness and United States Supreme Court precedent that require officers to articulate to a neutral issuing judge the "particular circumstances" that support the issuance of a no-knock entry warrant. Generalized fears do not justify dispensing with the constitutional requirement that officers knock and announce their presence and authority prior to executing a search warrant. The affidavit relied upon here to obtain the no-knock warrant was insufficient because it contained merely boilerplate language, speculative generalized statements about drug dealers and the fact that "numerous weapons *were removed*" from the residence three months prior to the challenged entry. (Emphasis added.) It did not provide particular facts and circumstances that reasonably justified the officer's suspicion that a risk of danger existed.

The majority opinion simply augments the facts presented in the affidavit used to support the no-knock warrant in an effort to distinguish this case from *Richards v. Wisconsin,* 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997), and move away from the admittedly boilerplate language

used in the affidavit. The majority states: "However the search warrant affidavit in this case also pointed to a specific, objective piece of information: that weapons were likely present in the house given that numerous weapons were seized from the exact location just three months previously." This statement assumes that because weapons were removed from the residence three months ago, they were likely present three months later. This supposition made by the majority was not even made by the affiant officer. There is nothing in the record to indicate that the removed weapons had been returned or that any new weapons were present. Likewise, there is no indication in the record as to what type of weapons were previously there or that the resident had any violent or aggressive propensities or history.

It is only by combining speculation and augmentation with overgeneralizations that the majority is able to conclude that the officer's suspicion is reasonable. Instead of this analysis, our task is to determine on this record whether specific facts justify the no-knock warrant.

In *Wilson v. Arkansas,* the Supreme Court made clear that the requirement that officers announce their presence and authority prior to entering a dwelling to execute a warrant is part of the reasonableness inquiry under the Fourth Amendment. 514 U.S. 927, 934, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). It is a flexible requirement that can yield to countervailing law enforcement interests; but the Supreme Court did not "attempt a comprehensive catalog" of those interests, leaving it instead to the lower courts to determine the reasonableness of unannounced entries. *See id.* at 936, 115 S.Ct. 1914.

In *Richards,* the Supreme Court emphasized that the knock and announce requirement protects interests that are not "inconsequential." 520 U.S. at 393 n. 5, 117 S.Ct. 1416. Although dispensing with the knock and announce requirement is "less intrusive" than a warrantless search, the individual interests implicated should not

be "unduly minimized." *Id.* The Court further stated that the knock and announce rule should yield when police officers have reasonable suspicion that abiding by the rule would endanger the officers or risk the destruction of evidence. *See id.* at 394, 117 S.Ct. 1416. However, the rule should not and cannot yield to the majority's speculation on the perceived exigencies of today's drug culture. *See id.* at 392 n. 4, 117 S.Ct. 1416 (quoting *Minnesota v. Dickerson,* 508 U.S. 366, 380, 113 S.Ct. 2130, 124 L.Ed.2d 334 (Scalia, J. concurring) ("[T]he purpose of the Fourth Amendment's requirement of reasonableness 'is to preserve that degree of respect for the privacy of persons and the inviolability of their property that existed when the provision was adopted—even if a later, less virtuous age should become accustomed to considering all sorts of intrusion reasonable.' ")); *see also Skinner v. Railway Labor Executives' Assoc.,* 489 U.S. 602, 635, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (Marshall, J. dissenting) ("History teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure. * * * [W]hen we allow fundamental freedoms to be sacrificed in the name of real or perceived exigency, we invariably come to regret it.").

I agree with the majority that the boilerplate language included in this warrant does not provide specific facts about the risks of this particular search that would justify a no-knock entry. The affiant officer admitted during the omnibus hearing that the language in the affidavit was "boiler plate." The state also conceded the point during oral arguments before this court. It is the responsibility of the affiant officers to provide the particular facts justifying the no-knock entry. A no-knock entry is only justified when the officers "have a reasonable suspicion that knocking and announcing their presence, *under the particular circumstances,* would be dangerous or futile, or that it would inhibit effective investigation of the crime * * *." *Richards,* 520 U.S. at 394, 117

S.Ct. 1416 (emphasis added). The Supreme Court acknowledged that the showing is "not high," but because knock and announce is a part of the constitutional reasonableness inquiry, "the police *should be required* to make it whenever the reasonableness of a no-knock entry is challenged." *Id.* at 394–95, 117 S.Ct. 1416 (emphasis added).

We ultimately have the responsibility to find "specific facts" to justify the no-knock entry. "[I]n each case, it is the duty of a court confronted with the question to determine whether *the facts and circumstances of the particular entry* justified dispensing with the knock-and-announce requirement." *Id.* at 394, 117 S.Ct. 1416 (emphasis added). We have also held "where there is no averment of *specific facts* indicating that an unannounced entry is needed in order to safely and successfully execute the warrant," a no-knock clause in a warrant may never be justified. *State v. Lien,* 265 N.W.2d 833, 838 (1978) (emphasis added).

The affiant officer admittedly used boilerplate language and therefore has failed to make a showing of reasonable suspicion "under the particular circumstances." *Richards,* 520 U.S. at 394, 117 S.Ct. 1416. This failure means that we cannot fulfill our duty to look at specific facts and assess reasonableness under the Constitution. Therefore, the boilerplate language is insufficient to support the no-knock entry as a matter of law.

In analyzing whether an allegation will suffice to make the suspicion of dangerousness reasonable, the Supreme Court has instructed police and reviewing courts to avoid using "overgeneralizations" about the drug "culture." *Id.* 392–93, 117 S.Ct. 1416. The majority attempts to avoid this restriction by pointing to the allegation that "since the execution of the June warrant Meixner had been willing to facilitate the sale of drugs at his residence to at least the CRI and perhaps others." The majority implicitly concedes that there is

nothing in the affidavit that would support the conclusion that Meixner himself continued to sell drugs after the June search. The CRI did not state that he had been able to purchase drugs from Meixner after the execution of the June warrant. Rather, the officer reported in his affidavit that the CRI stated that he had been able to purchase drugs from "Homer," whom the officer stated he knew to be Meixner, "during the course of the last year." We have no way of knowing whether any of those purchases were made in the period between the June 27, 1997 search and September 26, 1997, the date of the affidavit. Furthermore, we know from the affidavit that the CRI told the affiant on September 25, 1997—a day before the affidavit was given to the issuing judge—that the CRI had attempted to purchase drugs from Meixner within the previous 72 hours and had been unsuccessful. And although the CRI observed drug paraphernalia commonly used by methamphetamine-users, a hypodermic needle, a burnt spoon and broken Q-tips, Meixner himself did not agree to sell any methamphetamine to the CRI.

Instead, the majority states that the evidence supports the conclusion that Meixner was willing to facilitate drug sales because he told the CRI that he might be able to get methamphetamines from another person who might be at his residence on September 26, 1997, the day after the CRI spoke with Meixner. By inclusion of this fact, the affidavit contains a specific allegation involving drugs, but that allegation alone is insufficient to support the necessary showing of a reasonable suspicion of danger. *See Richards*, 520 U.S. at 393, 117 S.Ct. 1416 ("[W]hile drug investigation frequently does pose special risks to officer safety * * *, not every drug investigation will pose these risks to a substantial degree."). While this allegation may support a finding of probable cause justifying the issuance of a search warrant generally, it does not support the majority's conclusion that a no-knock entry, which requires a different showing, was reasonable. This obligation to provide the issuing judge and

this court with specific facts that reasonably support the officer's suspicion that this particular drug investigation posed a risk of danger can be fulfilled in advance of the search by the issuance of a no-knock warrant only so long as "sufficient cause" to issue the warrant is demonstrated. *See id.* at 396 n. 7, 117 S.Ct. 1416. Thus, we must determine whether the additional support the majority gleans from the affidavit provides sufficient cause to reasonably suspect that danger still existed at the time of the warrant's execution.

Any particularized suspicion of a risk of danger relating to the facilitation of a possible drug sale occurring on September 26, 1997, dissipated by the time the search warrant was actually executed on October 3, 1997, seven days after the warrant was issued and seven days after the sale was possibly to take place. *See generally State v. Yaritz*, 287 N.W.2d 13, 16 (Minn. 1979) (holding that delay in execution of a search warrant can be a constitutional violation where the supporting probable cause no longer exists). The continuity of the crime is a critical factor in determining the constitutionality of the delay. *See id.* at 17. In *Yaritz*, where the affidavit indicated that the sale of drugs was not a "single occurrence crime," but that the defendant was "in the business of selling drugs and that he had been doing it on a continuing basis," the probable cause to support the warrant had not grown stale when the warrant was executed six days after its issuance. *Id.*

In contrast, here there is no evidence in the record to support a suspicion of ongoing danger associated with Meixner allegedly facilitating the sale of drugs on a regular, continuing basis or to the CRI and "perhaps others." The affidavit contains no reference to other buyers or other sales after the June warrant was executed, to prior arrests for sales or to an ongoing "willing[ness] to facilitate" sales. Instead, the majority's additional support for its finding of reasonable suspicion consists of

generalized conclusions and speculative assumptions about the dangerous behavior of suspected drug dealers, or, here, facilitators of drug sales. Such generalized conclusions are constitutionally deficient to support a no-knock entry under *Richards*. 520 U.S. at 393, 117 S.Ct. 1416.

If overgeneralizations about today's drug culture will not suffice, the broader question presented by the majority's holding is what type of alleged activity will support conducting an otherwise valid search without complying with the knock and announce requirement. This affidavit had no specific facts to indicate danger, such as the severity of the resident's prior convictions, the particular danger of the alleged facilitating, or the type or use of weapons found in the prior search. The only convictions mentioned were for possession of controlled substances, not violent crimes. The CRI did not state that Meixner had a violent reputation or even that he had seen weapons at the residence when he was there within the three days before the warrant was issued. This court can neither augment the record nor presume endangerment of officer safety without a showing in the supporting affidavit of particular circumstances supporting a reasonable suspicion of danger in executing the search warrant.

The majority asserts that the "likely" presence of weapons will suffice to connect the alleged drug dealing with a suspicion of danger. The actual allegation as stated in the affidavit is that "numerous weapons had been removed from the residence" during the execution of a search warrant three months before the issuance of this warrant. On its face, this allegation indicated to the issuing judge that weapons "were removed" from the residence. Contrary to the majority's assertion, there is no allegation that weapons "were likely present" at the house. The majority

makes that unsupported factual leap even though the officer did not aver that the CRI had seen any weapons at the house. Furthermore, there is no allegation that Meixner was typically armed, that Meixner bought new weapons, that the seized weapons were returned to Meixner, or that Meixner had any propensity to use the weapons to protect his alleged facilitating. As to the prior search, there is no allegation that the weapons were easily accessible to Meixner or that they were brandished. In fact, the affiant officer testified at the omnibus hearing that during the execution of the prior search warrant, the seized weapons were not wielded to threaten officer safety at all. Finally, although one officer later testified that he thought the weapons had been returned, he did not know that fact for certain and he did not present that fact to the issuing judge. The fact that weapons, particularly "common northern Minnesota hunting rifles,"[1] were *removed*, without more information, that cannot support an objectively reasonable suspicion that knocking on that same door would be dangerous. *See, e.g., Ingram v. City of Columbus*, 185 F.3d 579, 589 n. 7 (6th Cir.1999) ("[T]he presence of a weapon creates an exigent circumstance, provided the government is able to prove they possessed information that the suspect was armed and likely to use a weapon or become violent" but the fact that defendant was engaged in a petty drug transaction by itself is not a reasonable basis to suspect that he was violent.).

The type of weapon involved is also relevant to our determination of the reasonableness of the officer's suspicion because it is circumstantial evidence of dangerousness. In *State v. Attaway*, the Supreme Court of New Mexico acknowledged that the mere presence of weapons was insufficient to justify a no-knock entry. 117 N.M. 141, 870 P.2d 103, 114 (1994). The court held that violent propensities must

1. The affirming officer did not provide the issuing judge with specific information about what type of weapons were at the residence or that they were even firearms. That information was not revealed until the omnibus hearing. At that point, it was revealed that the weapons removed were "common northern Minnesota hunting rifles."

be shown to justify a suspicion of a risk of danger, but circumstantial evidence can be used because direct evidence of danger is difficult to attain. *See id.* Possessing "a large cache of illegal or unusually dangerous weapons" would be circumstantial evidence of a propensity for violence, just as possession together with a violent criminal history would be. *Id.* at 115–16; *see also State v. Hider*, 715 A.2d 942, 946 (Me.1998) (a post-*Richards* decision in which the Supreme Court of Maine held that knowledge that the occupants possess a "large quantity of weapons" is sufficient to justify a no-knock entry into a place of business). Similarly, though the court did not have to decide the issue, the government has noted that:

> [W]hile a handgun might commonly be owned by a lawful and non-violent person, federal law outlaws possession of most sawed-off shotguns and TEC–9 machine pistols because they are easy to conceal, extremely dangerous, and particularly suited to close-quarters combat.

*United States v. Brown*, 69 F.Supp.2d 518, 520 (S.D.N.Y.1999) (citations omitted). "[C]ommon northern Minnesota hunting rifles" can be owned for lawful purposes—hunting. They are not easy to conceal. While these rifles are capable of inflicting great damage, they are not typically associated with the dangers of drug dealing—assaulting or killing police officers. Moreover, although the officer averred that "numerous weapons" had been seized, he did not even tell the reviewing court that they were firearms, nor did he allege that they were associated with Meixner's alleged drug dealing in any manner.

Furthermore, assuming arguendo that firearms were present, the state failed to present any facts in the record supporting a finding that the owner of the residence at issue could not legally possess the firearms. In Minnesota, when an owner of firearms has committed certain crimes, he is no longer allowed to possess certain weapons. *See* Minn.Stat. §§ 624.712, subds. 2, 3, 4, 7, 624.713, subd. 1(a)-(j) (1998); *cf.* 18 U.S.C. § 922(g)(1), (3) (1994). The state did not supply any specific information in the record about the crimes for which Meixner had been[2] convicted. We must examine the record as the state presented it. On this record, we cannot conclude that Meixner was illegally in possession of the firearms, if he indeed even had firearms. In fact, the state attempts to justify this search by pointing to the officer's testimony—not included in the affidavit—that he believed the weapons had been returned to a family member would justify the search. However, the state would have no obligation to return the weapons if they were legally seized and involved in the commission of a drug offense. *See generally* Minn.Stat. §§ 609.531, subd. 1(d); 609.5314, subd. 1(3)(i)-(iii), 609.5315, subds. 1, 3, 4, 609.5316, subd. 1 (1998). Thus, the state is trying to support a no-knock entry based on the presence of weapons, which they believe might have been returned after they may have been illegally seized.

**2.** Even if Meixner's crimes came under Minn. Stat. § 624.712, subd. 1(d) (1998), a provision which disqualifies those with certain drug charges from possessing certain types of weapons, "common northern Minnesota hunting rifles" have been specifically exempted by the legislature from the "felon in possession" bar to owning weapons. *See* Minn. Stat. § 624.711 (1998) ("It is not the intent of the legislature to regulate shotguns, rifles and other longguns of the type commonly used for hunting and not defined as pistols or semiautomatic military-style assault weapons * * *."). Further, without additional information about Meixner's charges, sentences and drug habits or addictions, we have no way of ascertaining the applicability of the federal firearm laws. *See* 18 U.S.C. 922(g)(1) (crime must be punishable by at least one year for federal law to be applicable); 18 U.S.C. 922(g)(3) (person must be unlawful user of or addicted to controlled substance for federal law to be applicable); *see generally United States v. Edwards*, 946 F.2d 1347, 1349 (8th Cir.1991) (holding that Minn.Stat. § 609.165 (1998) can restore a felon's civil rights so as to exempt a federal felon from federal statute proscribing possession of firearms by a felon).

While the majority purports to be conducting an analysis of the specific facts available to the issuing judge, it makes the same type of overgeneralizations that *Richards* rejected. The majority assumes the "likely" presence of weapons based on the fact that weapons were removed three months earlier and on that assumption justifies dispensing with the knock and announce requirement. What the majority loses sight of is that the particular circumstances required to dispense with knocking and announcing are those that connect "armed" with "dangerous" by making the inference that one "armed" is likely to be "dangerous" reasonable or those that connect a drug investigation with a particular risk of danger. *See, e.g., Gould v. Davis,* 165 F.3d 265, 272 (4th Cir.1998) ("We think a reasonable officer would have known that guns do not fire themselves, and that a justifiable fear for an officer's safety must include a belief, not simply that a gun may be located within a home, but that someone inside the home might be willing to use it."); *Richards,* 520 U.S. at 393, 117 S.Ct. 1416. It is not enough to articulate the objective "fact" that one is "likely" in possession of weapons or willing to facilitate drug sales, or even both, and then conclude that there is a reasonable suspicion of danger based on speculation about the return of the weapons and speculative generalizations about drug sales. While it is not necessary to definitively prove danger,[3] it is necessary to articulate "specific facts" or "particular circumstances" that make that suspicion of danger reasonable.

The majority opinion also runs afoul of the second concern in *Richards.* Under the rationale of the majority, a search pertaining to any of the many different types of crimes associated with weapons will justify the issuance of a no-knock warrant. The fact that weapons were once associated with the resident, without any further reasonable allegation that weapons are still present and accessible to the resident or that the resident is likely to use weapons, could now be a sufficient justification for abrogating the knock and announce rule in any later search of that residence. The Supreme Court specifically rejected such a per se approach, citing the extreme example of armed bank robbery: "Armed bank robbers, for example are, by definition, likely to have weapons, and the fruits of their crime may be destroyed without too much difficulty." *Richards,* 520 U.S. at 394, 117 S.Ct. 1416. The Court concluded however, "[i]f a *per*

---

3. Contrary to the majority's assertion, we do not suggest that danger must be definitively proven. We agree that *Richards* rejected boilerplate language to support a no-knock warrant. However, *Richards* did not posit the rule that any articulated fact about the place to be searched makes the suspicion of danger reasonable. Instead, *Richards* requires law enforcement officers to offer "particular circumstances" that support their suspicion that knocking and announcing "would be dangerous or futile." 520 U.S. at 394, 117 S.Ct. 1416. It is the "duty of the court" to find "facts and circumstances of the particular entry" that would support the reasonableness of the officer's suspicions. *Id.* Though we acknowledge that this creates responsibilities for law enforcement officers to articulate some particular facts relevant to danger or futility, not just to the underlying criminal activity, this is precisely what *Richards* requires: "Th[e reasonable suspicion] showing is not high, but the police *should be required* to make it * * *." *Id.* at 394–95, 117 S.Ct.

1416. Finally, the majority suggests that requiring officers to articulate facts that reasonably suggest dangerousness would result in creating the "rigid rule" shunned in *Wilson,* 514 U.S. at 934, 115 S.Ct. 1914. That "rigid rule" was one that would require that "every entry" be preceded by an announcement. *Id.* Just like the court in *Wilson,* we would reject such a rule. Nor would we require an "airtight case" in order to issue a no-knock warrant. Instead, what we require is what *Richards* requires: some evidence, summarized but not exhausted by the majority's list, that would allow us to conclude that the officer's suspicion of danger is reasonable. *See Richards,* 520 U.S. at 394, 117 S.Ct. 1416; *see also Wilson,* 514 U.S. at 936, 115 S.Ct. 1914 (holding that the knock and announce rule can yield to "a threat of physical violence" and citing cases with specific facts indicating dangerous—resident had "resolved * * * to resist even to the shedding of blood" and inhabitant was "firing pistols at [the officers]").

*se* exception were allowed for each category of criminal investigation that included a considerable—albeit hypothetical—risk of danger to officers * * * the knock and announce element of the Fourth Amendment's reasonableness requirement would be meaningless." *Id.* It seems clear from that example that the Supreme Court's interpretation of the Fourth Amendment reasonableness standard requires more than assumptions and "hypothetical" risks associated with specific types of crimes or the mere presence of weapons, it requires a showing of "particular circumstances," on a case-by-case basis.

The majority concludes that the appellant's reliance on pre-*Richards'* case law, which held that the mere presence of weapons alone will not justify a no-knock entry, is unjustified because those cases required the police to have an "objectively reasonable belief" that the suspect might respond to a knock and announce entry with violence, a standard the majority asserts is "higher" than the "reasonable suspicion" standard articulated in *Richards*. *See, e.g., United States v. Moore,*[4] 91 F.3d 96 (10th Cir.1996); *United States v. Spinelli,* 848 F.2d 26, 29 (2nd Cir.1988). For the proposition that "objectively reasonable belief" is a higher standard than "reasonable suspicion," the majority cites *United States v. Guebara,* 80 F.Supp.2d 1226, 1228 n. 2 (D.Kan.1999). In *Guebara,* a district court respectfully disagreed with the Tenth Circuit decision in *United States v. Jenkins,* 175 F.3d 1208, 1214 (10th Cir. 1999), which restated post-*Richards* the principle announced in *United States v. Moore,* 91 F.3d 96, 98 (10th Cir.1996), that the mere presence of firearms is insufficient to qualify as an exigent circumstance and justify a no-knock entry. *See Guebara,* 80 F.Supp.2d at 1228 n. 2. The dis-

trict court also acknowledged that the precedent in *Jenkins* binds it. *See Guebara,* 80 F.Supp.2d at 1228 n. 2. The court states: "The circuit's [principle] is predicated upon a showing that the officers held an 'objectively reasonable belief' of the existence of an emergency situation. This would appear to be a higher showing than the 'reasonable suspicion' standard announced [in *Richards*]." *Guebara,* 80 F.Supp.2d at 1228 n. 2.

I must respectfully disagree with the majority's conclusion that "objectively reasonable belief" is a different or higher standard than "reasonable suspicion." There is a distinction, which the majority loses sight of, between that level of suspicion that an officer feels and the role of a reviewing court in analyzing that suspicion. "Objectively reasonable belief" simply states the role of the reviewing court: to determine whether the officer's suspicion was reasonably justified. *See Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("As in other Fourth Amendment contexts, * * * the 'reasonableness' inquiry * * * is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them."); *see also Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("It is imperative that the facts be judged against an objective standard."). We have also recognized that the role of the reviewing court is to assess the objective reasonableness of the suspicion: "The principal components of a determination of reasonable suspicion * * * will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspi-

---

4. It should also be noted that the majority distinguishes these cases partially on the basis that they are pre-*Richards'* decisions. However, the Tenth Circuit has reaffirmed its holding in *Moore* since the *Richards'* decision. *See United States v. Jenkins,* 175 F.3d 1208, 1214 (10th Cir.1999). In addition, other circuits have also held that the mere pres-

ence of firearms will not justify a no-knock entry post-*Richards*. *See, e.g, United States v. Hawkins,* 139 F.3d 29, 32 (1st Cir.1998); *Gould v. Davis,* 165 F.3d 265, 272 (4th Cir. 1998); *Ingram,* 185 F.3d at 589 n. 7; *United States v. Weeks,* 160 F.3d 1210, 1214 (8th Cir.1998).

cion." *State v. Martinson,* 581 N.W.2d 846, 850 (Minn.1998) (citing *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).

The test articulated in *Richards* is "reasonable suspicion * * * under the particular circumstances." *Richards,* 520 U.S. at 394, 117 S.Ct. 1416 (citing *Terry,* 392 U.S. at 30, 88 S.Ct. 1868); *see also Ornelas,* 517 U.S. at 696, 116 S.Ct. 1657 ("We have described reasonable suspicion simply as 'a particularized and objective basis' for suspecting the person stopped of criminal activity * * *."). I cannot conclude that by using the term "reasonable suspicion" the Supreme Court intended to adopt a new standard that would not be analyzed by a reviewing court in the context of the particular facts and circumstances of the entry. The term was intended to have its historical, constitutional meaning.

As did the Supreme Court in *Richards,* I conclude that the "appropriate balance" between law enforcement safety and Fourth Amendment protections requires police officers to articulate "reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile * * *." *Richards,* 520 U.S. at 394, 117 S.Ct. 1416. This requirement does not place an undue burden on law enforcement. Still, it requires more than general conclusions about a specific category of crime or unsupported allegations that weapons might be present. Where weapons might be present, courts have required some allegation that indicates a resident's propensity to use the weapons, such as a past criminal history of violence, reputation of violence, or specific threats to police officers or others, to make the inference that the occupant is dangerous a reasonable one.[5] Though the difference between "armed" and "armed and dangerous" may be subtle, it is also determinative. In light of the requirements of the Fourth Amendment as articulated in *Richards* and *Lien,* it is not reasonable for the majority to assume the "likely" presence of weapons based solely on the previous removal of weapons and to overgeneralize about the drug "culture" to justify a no-knock entry.[6] Therefore, I would reverse the court of appeals and suppress the evidence obtained during the search.

PAGE, Justice (dissenting).

I join in the dissent of Justice Gilbert.

---

5. *See, e.g., United States v. Cooper,* 168 F.3d 336, 339 (8th Cir.1999) (no-knock reasonable where police "knew the house likely contained weapons, that it was barricaded, and that defendant had a violent criminal history"); *United States v. Grogins,* 163 F.3d 795, 796–98 (4th Cir.1998) (no-knock reasonable where defendant had "been involved in shootouts and had managed a drug-selling operation," "intimidated several people who owed him money by shooting into their dwellings," trained his associates in evidence destruction, and vowed to do "whatever is necessary to avoid going back to jail"); *Weeks,* 160 F.3d at 1214 (no-knock reasonable where informant told officer that those at "the residence answered the door with guns in their hands, [defendant] had been convicted of a firearm offense, and the front door was braced"); *Hawkins,* 139 F.3d at 32 (no-knock reasonable where defendant has "copious record of violent convictions" and police officer had personal knowledge of a recent armed action by him, and the officer's "suspicion that [defendant] was aware of the police interest in him").

6. The majority also decides the issues surrounding the threshold reappraisal. This analysis is unnecessary. In *Richards,* the Supreme Court noted that "[t]he practice of allowing magistrates to issue no-knock warrants seems entirely reasonable when sufficient cause to do so can be demonstrated ahead of time." *Richards,* 520 U.S. at 396 n. 7, 117 S.Ct. 1416. Though our *Lien* opinion suggests that a threshold reappraisal might be necessary even with advance judicial authorization, it appears that if particular circumstances of an exigency that are not of a time-sensitive nature, and thus will not grow stale, are presented to a issuing judge sufficient to justify the issuance of a no-knock warrant, the reasonable suspicion articulated in the warrant will justify the later no-knock execution. Because the majority is holding that weapons were "likely" present in the residence and thus, created an exigency not likely to diminish before the execution of the warrant, no threshold reappraisal was necessary and its sufficiency need not be assessed.

PAUL H. ANDERSON, Justice (dissenting).

I join in the dissent of Justice Gilbert.