*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A22-1772**

State of Minnesota,
Respondent,

vs.

Keevin Lashawn Hinton,
Appellant.

**Filed November 13, 2023**
**Affirmed**
**Bratvold, Judge**

Hennepin County District Court
File No. 27-CR-20-18183

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Linda M. Freyer, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Eva F. Wailes, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Bratvold, Presiding Judge; Reyes, Judge; and Smith, Tracy M., Judge.

**NONPRECEDENTIAL OPINION**

**BRATVOLD**, Judge

In this direct appeal from the district court's judgments of conviction for unlawful possession of a firearm or ammunition and fifth-degree drug possession, appellant raises three issues: (1) the district court erred by denying his motion to suppress evidence from a

search of his apartment; (2) the state's circumstantial evidence failed to prove beyond a reasonable doubt that he possessed the firearm, ammunition, and drugs found in his apartment; and (3) the district court erred by denying his motion to compel disclosure of information about a confidential informant. We first conclude that the district court did not err by denying the motion to suppress because probable cause supported the issuing judge's decision to issue the search warrant and law enforcement had reasonable suspicion for a no-knock entry. Second, we conclude that the record evidence was sufficient to sustain appellant's convictions. Third, we conclude that the district court did not err by denying appellant's motion to compel. Thus, we affirm.

**FACTS**

On August 21, 2020, respondent State of Minnesota charged appellant Keevin Lashawn Hinton with one count of possessing a firearm or ammunition as an ineligible person under Minn. Stat. § 624.713, subd. 1(2) (2020) (count one), and one count of fifth-degree controlled-substance crime (possession) under Minn. Stat. § 152.025, subd. 2(1) (2020) (count two). These charges were based on evidence that law enforcement obtained during a search of Hinton's apartment.

Six days after obtaining a warrant, on August 20, 2020, at approximately 5:30 a.m., law enforcement executed a no-knock search of Hinton's apartment. Hinton was inside the apartment. Law enforcement found "a black box in a cabinet above the refrigerator" that contained "razor blades, a small bindle of brown powder, and several plastic cards," one of which was a credit-union card with Hinton's name. The contents of the bindle field-tested positive for cocaine. Law enforcement also found "a Glock 40 pistol in a black

2

pouch near a bookshelf next to the bed." The gun "was loaded when it was found." In a closet, law enforcement located a box of ammunition inside a shoebox that also held men's shoes, a box of ammunition at the bottom of a black tote, and a bag of ammunition in the pocket of a multicolored jacket.

After the state charged Hinton, he moved to compel disclosure of information about the confidential reliable informant (CRI) who is mentioned in the warrant application. Hinton sought the CRI's name, date of birth, criminal history, and any payments or other consideration relating to the CRI's cooperation with law enforcement. In the alternative, Hinton moved for an order requiring the state to "provide all information that goes to the veracity of the CRI that does not identify the CRI." As an additional alternative, Hinton moved for "*in camera* review of all discovery regarding the identity, veracity, consistency, and accuracy of the CRI." The state opposed disclosure. The district court denied Hinton's motion to compel in a written decision, determining that Hinton "has not met his burden to show that the informant is a material witness or that the informant will provide testimony relevant to the material issue of guilt" or that the informant is "a hearsay declarant whose statements will be offered for the truth."

Hinton also moved to suppress "all evidence derived from the August 20, 2020 search" of his apartment. Hinton argued that (1) "the CRI's reliability and veracity of knowledge were not sufficiently corroborated," (2) the search-warrant affidavit does not "establish a nexus between [his] alleged illegal activity" and his apartment, and (3) the affidavit contains "boilerplate language . . . insufficient to support the no-knock entry." At a June 1, 2022 hearing, the district court ruled that the search warrant was "valid" and

denied Hinton's motion to suppress. The district court determined that law enforcement corroborated more than just "innocent details" from the CRI's tip, "the use of the canine" provided "the appropriate nexus for the search warrant," and the peace officer's affidavit contained "specifics for nighttime and no-knock" entry.

The district court conducted a bench trial in June 2022. The state called as witnesses four law-enforcement officers who testified about searching Hinton's apartment and finding contraband as described above. Hinton testified in his defense and called two other witnesses: his girlfriend and the peace officer who applied for the warrant to search Hinton's apartment.

We summarize Hinton's girlfriend's testimony while noting that the district court found her not credible, as is discussed in more detail below. Girlfriend testified as follows:

- She has dated Hinton "on and off for the past nine years."
- She has a conceal-and-carry permit and purchased a Glock 40 caliber handgun from a private seller in 2019.
- she usually carried the gun in "a small, black garment bag" inside of her purse.
- She "never told [Hinton] that [she] had a gun."
- In June 2020, Hinton "broke up with" her.
- Before the break-up, they lived with her parents and "kept all of [their] clothing in totes."
- She stored the boxes of ammunition for her gun in the bottom of a black tote and "stacked clothes on top" of the ammunition so Hinton "wouldn't know it was in there."
- After the breakup, she "took [her] clothes out" of the black tote and "put more of [Hinton's] clothes in there"; she was "hurt" and "angry" when going through the black tote and did not have the ammunition on her mind.
- The black tote also contained a multicolored jacket; Hinton had bought the jacket for her, and she would wear the jacket to the gun range and bring her own ammunition.
- The ammunition in the multicolored jacket was "left behind from the last time" she wore the jacket to the gun range.

4

- She would be "surprise[d]" to find out that one of the boxes of ammunition was later found outside the black tote in a shoebox.
- At some point, she "reconcile[d]" with Hinton, and they began dating again.
- There was "a really bad thunderstorm" the "weekend before" the August 20 search of Hinton's apartment; her house "lost power," so she "stayed over" at Hinton's apartment.
- When she slept at Hinton's apartment, she would "place [the gun] underneath the [book]shelf" near her side of the bed.
- On a night before August 20, she "left [Hinton's] in a rush because [she] had a feminine issue" and did not have the products she needed; as a result, she "[u]nintentionally" left her gun at Hinton's apartment.

We summarize Hinton's testimony while noting that the district court found him not credible, as is discussed in more detail below. Hinton testified as follows:

- He lived in a "very little" studio apartment.
- He was not sure how the black tote ended up in his apartment, but he "never looked in" it.
- He did not know how the multicolored jacket was moved from inside the tote to hanging in his closet.
- He did not go into the pocket of the jacket because he is "not a snooper" and does not "go through [girlfriend's] belongings."
- He would not know if someone put a gun near the bookshelf in his apartment because he does not go into that area.
- The bookshelf belonged to girlfriend because she is "an avid reader," and he "play[s] video games" and does not read so he has "no reason to be over" by the bookshelf.
- He had no knowledge of the gun and drugs in his apartment.
- At least three other people had keys to his apartment: his nephew, girlfriend, and a friend.
- The shoebox in his closet held his "funeral" shoes, but he did not know how the ammunition got in the shoebox.

On June 24, 2022, the district court issued its findings of fact, conclusions of law, verdict, and order. The district court found Hinton guilty of both counts—unlawful possession of a firearm or ammunition and fifth-degree drug possession. The district court determined that Hinton "knowingly constructively possessed a firearm and ammunition"

5

and "knowingly constructively possessed one or more mixtures containing a . . . controlled substance." The district court sentenced Hinton to 60 months in prison on count one, to be served concurrently with a stayed sentence of 19 months in prison on count two.

Hinton appeals.

## DECISION

**I.  The district court did not err by denying Hinton's motion to suppress evidence from the search of his apartment.**

Hinton challenges the search warrant on three grounds related to probable cause. He first argues that (1) "[t]he informant's information was not reliable or specific enough," (2) the affidavit "fail[ed] to establish a nexus between the contraband and Hinton's apartment," and (3) "the information was stale by the time the search warrant was executed." Hinton also argues that the warrant affidavit "failed to provide sufficient facts that would justify a no-knock entry."

We first summarize the record before the district court for the motion to suppress. Second, we consider Hinton's three probable-cause arguments. Third, we address Hinton's challenge to the no-knock entry by law enforcement.

On August 14, 2020, law enforcement applied for a "Daytime/Nighttime Unannounced Search Warrant" to search Hinton's Minneapolis apartment, which the district court granted that same day.

The search-warrant application included a peace officer's affidavit that described information received from a CRI. The CRI stated that Hinton was "in possession of a black handgun and selling crack cocaine. The CRI advised that [Hinton] was a member of the

6

street gang Vice Lords and lived near 26th and Fremont Ave. N. in the City of Minneapolis" and that Hinton "uses multiple vehicles to assist in the sale of narcotics." When law enforcement showed the CRI a "Hennepin County booking photo" of Hinton without his name attached, the CRI "confirmed" the photo was of "the individual the CRI knows as Keevin Hinton who is in possession of a black handgun and selling crack cocaine."

The affidavit also averred the following facts: Hennepin County jail records stated that Hinton was a member of the Vice Lords, which is a "violent gang . . . known to commit numerous violent crimes [including] weapon possession, narcotic sale, robbery, . . . shootings and murder." The Minnesota Bureau of Criminal Apprehension (BCA) website listed Hinton's address as a specific apartment building and unit on Fremont Avenue near 26th Street in Minneapolis. Law enforcement contacted apartment management for Hinton's building and learned Hinton was the "listed renter" for his specified apartment. Hinton's criminal history included convictions for drug and weapon offenses dating from 1989 to 2010. And on August 13, 2020, law enforcement conducted a canine sniff in the hallway outside Hinton's apartment. The canine "positively alerted [law enforcement] to the presence of narcotics coming from the door seams" of Hinton's apartment.

### A. The warrant was supported by probable cause.

Warrants may not be issued except upon probable cause. U.S. Const. amend. IV; Minn. Const. art. I, § 10. "Generally, a search is lawful only if it is executed pursuant to a valid search warrant issued by a neutral and detached magistrate after a finding of probable cause." *State v. Holiday*, 749 N.W.2d 833, 839 (Minn. App. 2008).

We apply "a totality of the circumstances test for determining whether a search warrant is supported by probable cause." *State v. Zanter*, 535 N.W.2d 624, 633 (Minn. 1995) (quotation omitted). Under this test, "courts must be careful not to review each component of the affidavit in isolation." *State v. Wiley*, 366 N.W.2d 265, 268 (Minn. 1985). "When reviewing a judge's decision to issue a search warrant," the appellate court's "only consideration is whether the issuing judge had a substantial basis for concluding that probable cause existed." *State v. Fawcett*, 884 N.W.2d 380, 384 (Minn. 2016) (quotation omitted). The "resolution of doubtful or marginal cases should be largely determined by the preference to be accorded to warrants." *State v. McCloskey*, 453 N.W.2d 700, 704 (Minn. 1990) (quotation omitted).

An appellate court's review of a district court's probable-cause determination gives "great deference" to the issuing court. *State v. Souto*, 578 N.W.2d 744, 747 (Minn. 1998). The district court's findings of fact are reviewed for clear error, and the determination of probable cause is reviewed de novo. *State v. Bradford*, 618 N.W.2d 782, 794 (Minn. 2000).

Hinton makes three challenges to the district court's probable-cause determination that we consider in turn.

### 1. The CRI's Reliability

First, Hinton contends that the CRI was "not reliable because the information he or she provided was innocuous and easily corroborated." At the June 1 hearing on Hinton's motion to suppress, the district court determined that the CRI's tip satisfied "the totality of the circumstances review."

The Minnesota Supreme Court has stated that "an informant's tip must have sufficient indicia of reliability for police to rely on the tip to sustain probable cause." *State v. Mosley*, 994 N.W.2d 883, 890 (Minn. 2023) (quotation omitted). When determining whether a CRI's tip has sufficient indicia of reliability, the informant's "reliability and basis of knowledge . . . are relevant considerations." *Id.* (quotation omitted); *see also State v. Munson*, 594 N.W.2d 128, 136 (Minn. 1999) (stating that a court may consider "the credibility and veracity of the informant" in determining whether a CRI's tip can establish probable cause to search). But the supreme court has cautioned that reliability and basis of knowledge "are not a rigid two-pronged test" and that "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Mosley*, 994 N.W.2d at 890 (quotation omitted); *see also Illinois v. Gates*, 462 U.S. 213, 230 (1983) (noting that an informant's veracity, reliability, and basis of knowledge are "closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is probable cause to believe that contraband or evidence is located in a particular place").

Hinton's brief to this court relies on "six factors for determining the reliability" of a CRI, as discussed by this court in *State v. Ross*, 676 N.W.2d 301, 304 (Minn. App. 2004).[1]

---

[1] The six factors are

> (1) a first-time citizen informant is presumably reliable; (2) an informant who has given reliable information in the past is likely also currently reliable; (3) an informant's reliability can be established if the police can corroborate the information; (4) the informant is presumably more reliable if the informant voluntarily comes forward; (5) in narcotics cases, "controlled purchase" is a term of art that indicates reliability; and (6) an

Hinton argues that "at least three of the *Ross* factors weigh against reliability, two others are neutral given their lack of information and only one weighs in favor of reliability." The state argues that "some of the [*Ross*] factors are mutually exclusive" such that a CRI need not satisfy all six to be reliable, and here, "reliability was established by the CRI's track record in providing reliable information to police in the past and by police corroboration of the CRI's tip."

While both Hinton and the state analyze the CRI's reliability by referring to each of the six factors discussed in *Ross*, we are not persuaded to follow this approach. The supreme court has never cited the *Ross* factors. Also, we agree with the state that a CRI's reliability does not depend on satisfying all six *Ross* factors. Indeed, in *Ross*, this court stated that only "the second and third factors are at issue" and reversed the district court's suppression of evidence based on those factors alone. 676 N.W.2d at 304-05. Thus, we follow the supreme court's direction and consider "the overall reliability of [the CRI's] tip." *Mosley*, 994 N.W.2d at 890. In doing so, we examine the CRI's track record, the CRI's basis of knowledge, and corroboration of the CRI's tip.

### a.      Track Record

The supreme court has determined that "[h]aving a proven track record is one of the primary indicia of an informant's veracity." *Munson*, 594 N.W.2d at 136. Hinton argues that "[t]he affidavit lacked any information as to how many times the informant had been

---

informant is minimally more reliable if the informant makes a statement against the informant's interests.
*Ross*, 676 N.W.2d at 304.

used by law enforcement in the past" and "how many successful arrests or convictions were obtained based on the informant's cooperation with law enforcement."

"[S]pecific details" regarding a CRI's track record are "not typically required." *Id.* For example, the supreme court in *Wiley* determined that a CRI was reliable based on the search-warrant affidavit's statement that the informant "has been used over several years successfully." 366 N.W.2d at 269. Similarly, in *Munson*, the supreme court determined that an officer's testimony that the CRI "had given the police reliable information in the past" was enough to show reliability. 594 N.W.2d at 136. In *Mosley*, the supreme court determined the CRI was "reliable" and noted that law enforcement provided "more detail" about the CRI's reliability than the supreme court required. 994 N.W.2d at 891. Law enforcement in *Mosley* testified that they "worked with the Informant multiple times before, . . . that the Informant's information was always accurate, always timely, and reliable," and that "the Informant's prior information resulted in arrests, charges, and convictions." *Id.*

Here, the search-warrant affidavit stated that the "CRI has worked with Law Enforcement in the past and has provided names and addresses . . . of suspects involved in distribution of narcotics and prohibited persons in possession of firearms in the Twin Cities metro area." The affidavit further stated that the "CRI has also provided accurate and reliable information that produced seizures of large quantities of narcotics and multiple firearms." The district court stated that the search-warrant affidavit contained "a fairly length[y] paragraph detailing the confidential informant's prior work with the police

11

officers," including a "specific[] mention[] that there's been seizures of quantities of narcotics and firearms based on this confidential informant's information."

We conclude that the search-warrant affidavit provided more details about the CRI's track record than is required by supreme court caselaw. *See Munson*, 594 N.W.2d at 136; *Wiley*, 366 N.W.2d at 269. Accordingly, we determine that the CRI's track record with law enforcement shows the CRI's reliability.

### b.    Basis of Knowledge

The supreme court has also stated that a CRI's "basis of knowledge" is a "relevant consideration[]" in determining whether a CRI's tip can sustain probable cause. *Mosley*, 994 N.W.2d at 890. "Assessment of the CRI's basis of knowledge involves consideration of the quantity and quality of detail in the CRI's report and whether police independently verified important details of the informant's report." *State v. Cook*, 610 N.W.2d 664, 668 (Minn. App. 2000), *rev. denied* (Minn. July 25, 2000).

Hinton argues that "the informant provided only generic information." The district court determined that the CRI provided "specific" information "not necessarily found on Google" about the color of the gun, the type of drug, and Hinton's gang affiliation. We agree with the district court. This court in *Holiday* concluded that a search warrant was supported by probable cause when "some of the details [supplied by the informant] were easily obtained (e.g., defendant's address)," but others were "not necessarily easily obtained," such as "gang affiliation." 749 N.W.2d at 841-42. Likewise, here, we conclude that the CRI supplied specific information, not all of which was easily obtainable, and this information was corroborated as further detailed below.

12

### c.     Corroboration

"[T]he fact that police can corroborate part of the informer's tip as truthful may suggest that the entire tip is reliable." *State v. Siegfried*, 274 N.W.2d 113, 115 (Minn. 1978). Further, "[t]he independent corroboration of even innocent details of an informant's tip may support a finding of probable cause." *Munson*, 594 N.W.2d at 136; *see also Mosley*, 994 N.W.2d at 892 (explaining that "when an informant gives police information based on the informant's personal knowledge, police do not need to corroborate significant details in the tip for the tip to be sufficient to support probable cause").

On appeal, Hinton argues that law enforcement independently corroborated only "easily verifiable pieces of information," such as Hinton's "identity and residence." The district court stated that while "a lot" of the corroborating information regarding the CRI's tip "could be found on Google," law enforcement was "able to corroborate not only innocent details," like Hinton's address, but details such as Hinton's "specific gang affiliation."

We conclude that law enforcement corroborated many details of the CRI's tip. Jail records listed Hinton as a member of the Vice Lords street gang; the BCA website listed Hinton's address at a particular apartment on Fremont Avenue, and apartment management confirmed Hinton was a renter of the unit listed by the BCA; the CRI confirmed Hinton's identity when shown an unlabeled booking photo; Hinton's criminal history showed prior convictions involving drugs and weapons; and a canine sniff of Hinton's apartment door

13

was "positive[]" for "the presence of narcotics."[2] Law enforcement's corroboration of many details of the CRI's tip indicates the CRI's sufficient basis of knowledge and supports the district court's determination that the CRI's tip "satisf[ied] the adequate standard."

In sum, after considering the CRI's track record, the CRI's basis of knowledge, and the corroboration of the CRI's tip, we conclude that the tip had "sufficient indicia of reliability." *Mosley*, 994 N.W.2d at 890. Thus, the district court did not err by determining that law enforcement could rely on the CRI's tip to show probable cause for the warrant.

2. **Nexus Between the Facts in the Search-Warrant Affidavit and the Contraband Sought at Hinton's Apartment**

Hinton argues that the CRI's information "did not provide a nexus to contraband at [Hinton's] apartment," relying on *State v. Ward*, 580 N.W.2d 67 (Minn. App. 1998). The state argues that "it was reasonable for the issuing magistrate to infer that [Hinton] would keep narcotics in a location convenient for him, such as his residence, and then transfer the narcotics to one of the vehicles" allegedly used for sales.

Probable cause requires "that there is a fair probability that the evidence will be found at the specific site to be searched." *State v. Yarbrough*, 841 N.W.2d 619, 622 (Minn. 2014). In other words, there must be "a sufficient nexus . . . between the evidence sought

---

[2] Hinton cites *State v. Gabbert*, in which this court determined that "[b]ecause the anonymous tipster's information was insufficiently corroborated, the issuing judge did not have probable cause to issue the search warrant." 411 N.W.2d 209, 213 (Minn. App. 1987). Hinton argues that "like *Gabbert*, the informant should not be deemed reliable as police only verified innocent details that were not sufficient to provide probable cause." But in *Gabbert*, "the brunt of the information provided by the [anonymous tipster] was actually disproved by the officers' subsequent investigation." *Id.* at 212. Further, the tipster in *Gabbert* was anonymous and not a CRI, as here. *Id.* Thus, *Gabbert* is distinguishable.

14

and the place to be searched." *Id.* "[T]he nexus may be inferred from the totality of the circumstances, including the type of crime involved, the nature of the items sought, the extent of an opportunity for concealment, and reasonable assumptions about where a suspect would likely keep that evidence." *State v. Ruoho*, 685 N.W.2d 451, 456 (Minn. App. 2004), *rev. denied* (Minn. Nov. 16, 2004).

The district court determined that, on its own, "what the confidential informant said doesn't really provide [a nexus] to [Hinton's] apartment. However, that is what the canine dog does." The district court stated that the CRI's "information that then got corroborated with respect to where the apartment is, provided enough reasonable articulable suspicion to deploy the use of the canine," and the canine's positive alert on Hinton's door "was then the appropriate nexus for the search warrant."

We conclude that the search-warrant affidavit provides a sufficient nexus for two reasons. First, Hinton's comparison to *Ward* is unpersuasive. In *Ward*, this court concluded that a warrant to search a hotel room lacked probable cause because the only link between the defendant and the drugs found in the hotel room was the defendant's occupancy of the room 72 hours before the warrant application. 580 N.W.2d at 73-75. Hinton argues that "[i]f the warrant was insufficient in *Ward*, where the informant obtained marijuana within 72 hours of the warrant's execution, then the same must be true of this warrant, which was executed at least a week after" the CRI's tip. But this court in *Ward* noted that "it is far less likely that a suspect will continue to occupy a hotel room, as compared with a permanent residence, after a period of days." *Id.* at 73-74. Because the warrant here rested on

15

information that Hinton sold crack cocaine and involved a search of Hinton's apartment, *Ward* is distinguishable.

Second, it was reasonable for the issuing judge to infer that Hinton kept drugs at his apartment. "[A]n issuing magistrate is entitled to draw common-sense and reasonable inferences from the facts and circumstances given" in the search-warrant affidavit. *Holiday*, 749 N.W.2d at 843 (quotation omitted). The affidavit attested that the CRI stated Hinton "uses multiple vehicles to assist in the sale of narcotics."

This court has determined that it was "reasonable" for an issuing magistrate to infer that a defendant "who sold drugs from his automobile, kept a supply of drugs and proceeds from drug sales at his residence" when "[n]o evidence suggested" the defendant "stored drugs in a separate place." *State v. Bynum*, 579 N.W.2d 485, 487 (Minn. App. 1998), *rev. denied* (Minn. Aug. 18, 1998). Because the search-warrant affidavit indicated that Hinton sold drugs via multiple vehicles, the issuing judge could reasonably infer that Hinton kept drugs and related evidence in his apartment. *Cf. Souto*, 578 N.W.2d at 748-49 (determining that the affidavit "failed to establish a sufficient nexus" to defendant's home where the affidavit "did not indicate that [defendant] ever arranged drug deals, sold, or distributed drugs, much less that she performed such acts from her home"); *State v. Kahn*, 555 N.W.2d 15, 18 (Minn. App. 1996) (declining to find "a reasonable nexus" between defendant's "*possession* of one ounce of cocaine in Minneapolis" and "possible evidence or contraband at his residence 75 to 85 miles away" (emphasis added)).

For the first time on appeal, Hinton challenges the canine sniff, arguing that law enforcement lacked reasonable, articulable suspicion because the CRI provided

16

information that Hinton was selling drugs on the streets "but had no information regarding Hinton's residence." We "generally will not decide issues which were not raised before the district court." *Roby v. State*, 547 N.W.2d 354, 357 (Minn. 1996). We may, however, address an issue for the first time on appeal if "the issue will not work an unfair surprise on a party" and the record "permits us to address such an issue." *State v. Gauster*, 752 N.W.2d 496, 508 (Minn. 2008) (quotation omitted). Here, the district court determined there was reasonable, articulable suspicion for the canine search and the parties' briefs to this court address the issue of reasonable, articulable suspicion. Accordingly, we consider whether law enforcement had reasonable, articulable suspicion for the canine sniff of the door seams of Hinton's apartment.

"[P]olice need only reasonable, articulable suspicion of criminal activity in order to conduct a dog sniff, provided they are lawfully present in the place where the sniff is conducted." *State v. Edstrom*, 916 N.W.2d 512, 523 (Minn. 2018). "Reasonable suspicion must be based on specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *State v. Davis*, 732 N.W.2d 173, 182 (Minn. 2007) (quotation omitted). "The requisite showing is not high." *Id.* (quotation omitted). "The reasonable suspicion standard can also be met based on information provided by a reliable informant." *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008).

The state contends that the CRI's information "provided reasonable suspicion . . . and thus supported the deployment of a narcotics-sniffing dog." We agree. As detailed above, the CRI's tip had sufficient indicia of reliability. Thus, the CRI's

information that Hinton was selling crack cocaine from multiple vehicles gave law enforcement "more than an unarticulated hunch" to support a canine sniff in the hallway outside Hinton's apartment. *Davis*, 732 N.W.2d at 182. The canine's positive alert to the presence of narcotics at Hinton's apartment-door seam established "a fair probability that the evidence [of drugs would] be found" in Hinton's apartment. *Yarbrough*, 841 N.W.2d at 622. Indeed, Hinton does not challenge the district court's determination that the information from the canine sniff of his apartment-door seam provided the "appropriate nexus for the search warrant."

We therefore conclude that the totality of the circumstances provides a nexus between the contraband sought and Hinton's apartment, and accordingly, the district court did not err in determining there was a sufficient nexus.

### 3. Staleness of the Search Warrant

Hinton contends that "[t]he warrant application was also deficient because the information was stale by the time the warrant was executed" six days after it was issued. Hinton raises this argument for the first time on appeal, and as noted above, we generally decline to decide issues not raised in district court. *Roby*, 547 N.W.2d at 357. But because the facts are undisputed and this issue is addressed in the parties' briefs, we consider Hinton's staleness argument. *See Gauster*, 752 N.W.2d at 508; *see also McKenzie v. State*, 872 N.W.2d 865, 872 (Minn. 2015) (stating that a party is not disadvantaged by a court's

consideration of an issue for the first time on appeal "when the previously unaddressed issue involved a legal question and the parties had an opportunity to brief the question").

Under Minnesota law, a search warrant must be executed "within ten days after its date" or it "is void." Minn. Stat. § 626.15(a) (2020). A search-warrant affidavit must contain proof "of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *Souto*, 578 N.W.2d at 750 (quotation omitted). "Factors relating to staleness include whether there is any indication of ongoing criminal activity, whether the articles sought are innocuous or incriminating, whether the property sought is easily disposable or transferable, and whether the items sought are of enduring utility." *Id.* Staleness "must be determined by the circumstances of each case," and the court's "approach should be one of flexibility and common sense." *State v. King*, 690 N.W.2d 397, 401 (Minn. App. 2005) (quotation omitted), *rev. denied* (Minn. Mar. 29, 2005).

Hinton argues that because the CRI "did not say that Hinton was selling drugs or had possessed the firearm *on a continuing basis*," the warrant was stale. (Emphasis added.) The state argues that the warrant provided a "clear indication of ongoing criminal activity" based on the CRI's information that Hinton was "selling crack cocaine" using "multiple vehicles" and the canine's "positive alert for narcotics at [Hinton's] apartment door several days after the CRI's report of narcotics sales." The state contends that Hinton appears to argue that the search-warrant affidavit "did not use the term 'ongoing criminal activity' or 'continuing criminal activity,'" but there is "no case law holding that this term of art must be used."

19

Caselaw supports the state's arguments. In *State v. Yaritz*, the supreme court determined that a warrant executed six days after it was issued was not stale because the affidavit "indicate[d] that defendant was in the business of selling drugs and that he had been doing it on a continuing basis." 287 N.W.2d 13, 17 (Minn. 1979). The affidavit in *Yaritz* stated that an informant told law enforcement the defendant was selling drugs, the informant made two controlled buys of the drugs, and surveillance indicated the defendant used two different vehicles to meet people for possible drug sales. *Id.* at 14 n.1. In *State v. Cavegn*, the supreme court held that the information in a search-warrant affidavit was not stale and indicated ongoing criminal activity where a CRI stated that the defendant was selling drugs and law enforcement observed a controlled buy of the drugs. 356 N.W.2d 671, 672-74 (Minn. 1984).

Here, the search-warrant affidavit contained information from a CRI that is similar to the information in *Yaritz* and *Cavegn* that suggested ongoing drug sales and was determined to support probable cause. Because the affidavit indicated that Hinton was engaged in ongoing criminal activity, we reject Hinton's arguments that the warrant was stale because the CRI did not use the exact phrase "ongoing criminal activity." Thus, we conclude that the warrant was not stale when executed six days after issued.

To summarize our analysis of probable cause, we determine that the CRI's tip had sufficient indicia of reliability, the search-warrant affidavit provided a sufficient nexus between the contraband sought and Hinton's apartment, and the warrant was not stale. The district court therefore did not err by determining the issuing judge had a substantial basis for concluding that probable cause to search existed.

**B.     The no-knock entry was supported by reasonable suspicion.**

Hinton argues that "[t]he warrant application failed to provide sufficient facts that would justify a no-knock entry."[3] To justify a no-knock entry, "police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *State v. Wasson*, 615 N.W.2d 316, 320 (Minn. 2000) (quotation omitted). "In other contexts [appellate courts] ha[ve] defined reasonable suspicion as something more than an unarticulated hunch." *Id.* "Boilerplate language that an announced entry would be dangerous is insufficient." *Id.* "When the material facts are undisputed, [appellate courts] independently determine whether evidence obtained during a search conducted with a no-knock warrant should be suppressed." *State v. Goodwin*, 686 N.W.2d 40, 43 (Minn. App. 2004), *rev. denied* (Minn. Dec. 14, 2004).

The district court determined that reasonable suspicion supported the issuing judge's decision allowing a no-knock entry. The district court stated that the affidavit "did not only use . . . boilerplate" language but gave "specifics for nighttime and no-knock

---

[3] After Hinton's offenses, the legislature amended the no-knock-warrant statute. 2023 Minn. Laws ch. 52, art. 9, §§ 5-7, at 145-46. The amendment provides that "[a] court may not issue or approve a no-knock search warrant unless the judge determines that the applicant has articulated specific, objective facts that establish probable cause for belief that: (1) the search cannot be executed while the premises is unoccupied;" and (2) the individual occupying the premises "present[s] an imminent threat of death or great bodily harm to the officers executing the warrant or other persons." 2023 Minn. Laws ch. 52, art. 9, § 6, at 146. Because the amendment occurred after Hinton's 2020 offenses, we do not analyze the no-knock entry under this amended standard.

[entry], which was the confidential informant's information that [Hinton] was in possession of a firearm, . . . that he has prior convictions that were specifically for murder, fleeing, and weapons possession," and "that he is known to have gang, Vice Lord, affiliations," and that "[w]hat the officer specifically knows of that particular gang is listed."

In his brief to this court, Hinton argues that the affidavit relied on "boilerplate language that courts have rejected as insufficient" and "lacked the particularized facts to give police reasonable suspicion to believe an unannounced entry was necessary." The state contends that the affidavit contained "specific facts" establishing reasonable suspicion for a no-knock entry.

The state's argument is persuasive. The affidavit contained some boilerplate language that a no-knock entry was "necessary to prevent the loss, destruction, or removal of the objects of the search, or to protect the safety of the searchers or the public." But the affidavit also provided specifics about why announcing entry or entering during daytime hours would be dangerous. The affidavit referenced "the CRI information that Hinton is in possession of a firearm" and that Hinton "has prior convictions for murder, fleeing and weapons possession, and that [Hinton's apartment] is [in] an apartment complex surrounded by multiple residences and near a transit stop where numerous members of the public reside." The affidavit further noted that "Hinton is affiliated with the gang Vice Lords who [law enforcement] knows is a very violent gang who are known to commit numerous violent crimes."

The specifics regarding Hinton's violent gang affiliation, his past convictions, his possession of a gun, and the location of his apartment in a populous area provided

reasonable suspicion that a no-knock entry was necessary for the safety of law enforcement and the public. *See Wasson*, 615 N.W.2d at 320-21 (determining that the reasonable-suspicion standard was satisfied where the affidavit contained some "admittedly boilerplate language" but "also pointed to a specific objective piece of information"). Thus, the district court did not err by concluding that reasonable suspicion supported the issuing judge's decision to allow no-knock entry into Hinton's apartment.

## II. The evidence was sufficient to sustain Hinton's convictions for possession of the firearm, ammunition, and drugs found in his apartment.

Hinton argues that the trial evidence was insufficient to support his convictions for possession of a firearm or ammunition by an ineligible person and fifth-degree controlled-substance crime (possession). Due process requires that the state prove beyond a reasonable doubt every fact necessary to constitute the crime charged. *State v. Hage*, 595 N.W.2d 200, 204 (Minn. 1999).

Here, the state was required to prove that Hinton knowingly possessed a firearm or ammunition for count one and that he knowingly possessed one or more mixtures containing a Schedule I controlled substance for count two. *See* Minn. Stat §§ 624.713, subd. 1(2), 152.025, subd. 2(1); 10A *Minnesota Practice*, CRIMJIG 20.36, 32.21 (2022). In its findings of fact, conclusions of law, verdict, and order, the district court concluded that as to count one, Hinton "knowingly constructively possessed a firearm *and* ammunition" and that as to count two, Hinton "knowingly constructively possessed . . . a controlled substance." (Emphasis added.) Hinton challenges the state's evidence that he

constructively possessed the firearm, ammunition, and drugs. Hinton does not challenge the other elements of his convictions.

When the state does not prove that a defendant had actual possession, or "direct physical control," over an item, such as drugs or firearms, the state may satisfy its burden of proof by showing constructive possession. *State v. Barker*, 888 N.W.2d 348, 353 (Minn. App. 2016). To prove constructive possession, the state must show either (a) that law enforcement found the item in a location "under defendant's exclusive control to which other people did not normally have access," or (b) if law enforcement found the item in a location others could access, that "there is a strong probability (inferable from other evidence) that defendant was at the time consciously exercising dominion and control over it." *State v. Florine*, 226 N.W.2d 609, 611 (Minn. 1975).[4] "A defendant may possess an item jointly with another person." *State v. Harris*, 895 N.W.2d 592, 601 (Minn. 2017).

In evaluating the sufficiency of the evidence to sustain a conviction, appellate courts "review criminal bench trials the same as jury trials." *State v. Holliday*, 745 N.W.2d 556,

---

[4] Hinton's brief to this court argues that "the application of the constructive-possession doctrine [is] problematic." Hinton relies on the following language from *Florine*: the constructive-possession doctrine applies where the state cannot prove actual possession but "where the inference is strong that the defendant *at one time physically possessed the substance and did not abandon his possessory interest* in the substance but rather continued to exercise dominion and control over it up to the time of the arrest." 226 N.W.2d at 610 (emphasis added). Hinton contends that "because there was no evidence that Hinton had ever physically possessed the firearm and ammunition, he had no possessory interest in it to abandon." Hinton appears to argue that prior physical possession is an element of constructive possession. We are not persuaded. Neither *Florine* nor other controlling caselaw makes prior physical possession an element of constructive possession. *See id*. at 611. Further, the record evidence suggests that Hinton at one time physically possessed the contraband found in his studio apartment.

562 (Minn. 2008) (quotation omitted). "Circumstantial evidence is entitled to the same weight as direct evidence; however, if a conviction is based on circumstantial evidence, a higher level of scrutiny is warranted." *Bernhardt v. State*, 684 N.W.2d 465, 477 (Minn. 2004). Hinton and the state analyze the "possession" element of counts one and two based on circumstantial evidence.

When analyzing a conviction based on circumstantial evidence, we apply a two-step process. *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). First, we identify the circumstances proved, deferring "to the [fact-finder]'s acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." *Id.* at 598-99. In other words, we "consider only those circumstances that are consistent with the verdict." *Id.* at 599. Second, we determine whether the circumstances proved are (a) "consistent with guilt" and (b) "inconsistent with any rational hypothesis except that of guilt," giving "no deference to the fact finder's choice between reasonable inferences." *Id.* (quotations omitted).

The district court's order concluded that Hinton knowingly possessed a firearm, ammunition, and a controlled substance. The order included detailed credibility determinations, and we defer to those determinations. *See State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010) (explaining that "the trier of fact is in the best position to determine credibility and weigh the evidence"). The district court did "not find [Hinton's] testimony, with respect to the firearms, ammunition and drugs, to be credible." The district court found "not plausible" Hinton's assertion that "he had no idea there was a gun, ammunition, and a box with a controlled substance located in various places throughout his small

25

apartment." The district court also did "not find [girlfriend's] testimony credible," noting that "oftentimes her testimony seemed too rehearsed and lacked the nuance typically seen when a witness is testifying truthfully from direct knowledge."

### A. The circumstantial evidence was sufficient to prove that Hinton possessed a firearm or ammunition.

We first consider the sufficiency of the evidence for the possession element in count one. The circumstances proved are the following. Law enforcement found a loaded gun and two boxes and a bag of ammunition in Hinton's small studio apartment, where he lived by himself. Three others had a key to the apartment and occasionally accessed it. The loaded gun was found in a black pouch next to a bookshelf containing video games, which Hinton plays, and the gun was within arm's reach of Hinton's bed. Law enforcement found ammunition in Hinton's closet in the pocket of a multicolored jacket that was hanging next to his clothes, in a black tote that also held Hinton's clothes, and in a box with Hinton's funeral shoes.

Hinton argues that the circumstances proved for count one are not consistent with guilt for two reasons that we consider in turn. First, he argues girlfriend "exercised sole possession of the firearm and ammunition in the tote and jacket pocket" and "one of the other persons who had access to the apartment left the ammunition in the shoe box." We disagree because Hinton's argument rests on evidence that is not part of the circumstances proved. The circumstances proved "do not include every circumstance as to which there may be some testimony in the case, but only such circumstances as the [fact-finder] finds proved by the evidence." *State v. Stein*, 776 N.W.2d 709, 715 (Minn. 2010) (quotation

omitted). Identifying the circumstances proved "requires an appellate court to winnow down the evidence presented at trial" to that which "preserve[s] the [fact-finder's] credibility findings" and weighing of the evidence. *Harris*, 895 N.W.2d at 600.

The district court did not find girlfriend's testimony credible and found it "illogical" that she "left a loaded firearm simply lying . . . on the floor of [Hinton's] apartment right next to where [Hinton] sleeps" and that she "would forget about three different containers of ammunition and allow the ammunition to make its way into [Hinton's] apartment." Because girlfriend's testimony was deemed not credible by the district court, Hinton cannot rely on it to argue that the circumstances proved show girlfriend exercised sole possession of the firearm and ammunition. We therefore disregard girlfriend's testimony and conclude that the circumstances proved show that Hinton knowingly possessed the firearm and ammunition in his apartment and are consistent with guilt.[5]

Second, Hinton argues that the district court erred by concluding that Hinton constructively possessed the firearm because he "had dominion and control *over the area* where the firearm was found." Hinton contends that caselaw requires the state to prove that "Hinton had dominion and control over *the firearm itself*." (Emphasis added.)

We have held that "a defendant must exercise dominion and control over the [item] itself in order to constructively possess it." *State v. Hunter*, 857 N.W.2d 537, 542 (Minn. App. 2014). Here, the district court stated that "[a] person is in constructive possession of

---

[5] Also, Hinton's argument fails to recognize that a person may jointly possess contraband. *Harris*, 895 N.W.2d at 601. So, the district court may have found that the loaded gun belonged to girlfriend and that Hinton exercised dominion and control over it at the time police found the gun in his apartment.

a firearm if . . . the person knowingly exercised dominion and control *over the firearm*." (Emphasis added.) And the district court's analysis of the evidence was specific to Hinton's control over the firearm itself. The district court noted that Hinton "was sleeping alone on an inflatable bed" and that "[t]he gun was right next to the bed and within arm's reach of [Hinton's] position on the bed." Thus, the district court properly applied the law in finding that Hinton knowingly constructively possessed the firearm, despite its statement that Hinton exercised dominion and control over the "area where the firearm was found."

We next consider whether the circumstances proved are inconsistent with any rational hypothesis except that of guilt. *Silvernail*, 831 N.W.2d at 599. Hinton argues that the circumstances proved support a reasonable alternative hypothesis that he "lacked knowledge" of the firearm and ammunition in his apartment.

Under count one, the state was required to prove that Hinton knowingly possessed a firearm *or* ammunition. *See* Minn. Stat § 624.713, subd. 1(2); 10A *Minnesota Practice*, CRIMJIG 20.36, 32.21 (2022). We therefore need only consider Hinton's alternative hypothesis regarding the firearm *or* ammunition. As to the firearm, Hinton asserts that even if he saw the black bag that the loaded gun was in, "it is entirely reasonable that he did not reach down . . . to retrieve it." We disagree.

The circumstances proved establish that Hinton lived in a small studio apartment in which the loaded gun was in arm's reach of his bed and next to the video games he plays. And as noted above, the district court did not find credible Hinton's testimony that he had no idea there was a gun in his "very little" studio apartment. Thus, we conclude that

Hinton's theory that he lacked knowledge of the loaded gun is not a reasonable alternative hypothesis supported by the circumstances proved.

Because count one only required the state to prove that Hinton knowingly possessed a firearm *or* ammunition and we have concluded that the evidence was sufficient to show that Hinton knowingly possessed a loaded gun, we need not consider whether Hinton knowingly possessed the ammunition in the tote, multicolored jacket, and shoebox. The district court concluded that under count one, Hinton knowingly possessed a gun *and* ammunition. This finding may be due to the record evidence showing that the gun was loaded when found. For the sake of completeness, we consider whether the circumstances proved support Hinton's alternative hypothesis that he was unaware of the ammunition in his shoebox.

Hinton argues that "it is a reasonable possibility that Hinton's nephew or someone else" accessed the shoebox "to hide their own contraband" and that Hinton only saw "the exterior of the box[]." We are not persuaded. Hinton acknowledged at trial that the shoes in the shoebox were his, and the district court found it "not plausible [that Hinton] was unaware of a box of ammunition resting on top of his own shoes." Caselaw indicates that it is reasonable to infer possession of a disputed item when a defendant's other possessions are found in the same location. *See, e.g., State v. Colsch*, 284 N.W.2d 839, 841 (Minn. 1979) (concluding there was sufficient evidence male defendant constructively possessed drugs when they were found in a bedroom containing male clothing and papers and a checkbook bearing defendant's name).

29

The circumstances proved fail to show someone else with access to Hinton's apartment solely possessed the ammunition found in Hinton's shoebox. Hinton testified that his nephew, girlfriend, and his friend "had a key to [his] apartment." But this evidence alone does not reasonably support an inference that one of these other people solely possessed the ammunition in Hinton's shoebox. First, we need not consider Hinton's testimony because the district court found it not credible and that it was "not plausible [Hinton] was unaware of a box of ammunition resting on top of his own shoes." Second, we "will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture." *Al-Naseer*, 788 N.W.2d at 473.[6] Accordingly, we conclude that the circumstances proved do not support Hinton's theory that he lacked knowledge of the ammunition in his shoebox.

In sum, the evidence was sufficient to support Hinton's conviction for possession of a firearm or ammunition by an ineligible person.

**B.    The circumstantial evidence was sufficient to prove that Hinton possessed a controlled substance.**

Next, we consider the sufficiency of the evidence to sustain the finding of Hinton's possession of drugs for count two. The circumstances proved are the following. As noted above, Hinton lived in a small studio apartment by himself, which others occasionally accessed. Law enforcement found a box on top of Hinton's refrigerator containing both a controlled substance and a credit-union card with Hinton's name.

---

[6] As discussed *supra* note 5, Hinton's argument fails to consider that evidence of joint possession is sufficient to support a conviction under the charged statute.

On appeal, Hinton contends that the circumstances proved are not consistent with guilt because "one of the other persons who had access to the apartment" left a controlled substance in the box above Hinton's refrigerator. But Hinton's brief to this court ignores the evidence that his credit-union card was found in the box alongside the controlled substance. The circumstances proved are therefore consistent with guilt and Hinton's knowing possession of a controlled substance.

We also determine that Hinton's alterative hypothesis is not reasonable. Like with the ammunition in the shoebox, Hinton contends that "it is a reasonable possibility that Hinton's nephew or someone else" accessed the top of the refrigerator to "hide their own contraband" and that Hinton had "no knowledge" because he could only see the exterior of the box. As detailed above, the evidence that other people had access to Hinton's apartment rests on Hinton's credibility, which the district court discredited. Also, Hinton's own testimony does not reasonably support the alternative hypothesis that "someone else" possessed the controlled substance found in a box with his credit-union card. *See State v. Tscheu*, 758 N.W.2d 849, 861 (Minn. 2008) (refusing to reverse a conviction based on "mere conjecture or the possibility of innocence when the evidence shows such possibility is unreasonable"). We conclude that the circumstances proved for count two are inconsistent with any rational hypothesis except that of Hinton's constructive possession of the drugs, and thus, the evidence was sufficient to support Hinton's conviction for fifth-degree possession of a controlled substance.

**III.** **The district court did not abuse its discretion by denying Hinton's motion to compel disclosure of information about the confidential informant.**

Hinton challenges the district court's denial of his motion to compel disclosure of information about the CRI, arguing that his "right to prepare his defense outweighed the state's privilege to withhold information regarding the informant." Appellate courts "review a district court order regarding disclosure of a confidential informant's identity for an abuse of discretion." *State v. Rambahal*, 751 N.W.2d 84, 90 (Minn. 2008). "The state has a legitimate interest in protecting the identity of persons who provide information to law enforcement." *State v. Litzau*, 650 N.W.2d 177, 184 (Minn. 2002). The state's privilege to withhold a CRI's identity "is not unlimited, however, and it gives way when the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Rambahal*, 751 N.W.2d at 90 (quotation omitted).

The supreme court has outlined four factors that district courts should consider in determining whether to order disclosure of information about a CRI: "(1) [w]hether the informant was a material witness; (2) [w]hether [the] informer's testimony will be material to the issue of guilt; (3) [w]hether testimony of officers is suspect; and (4) [w]hether the informant's testimony might disclose entrapment." *Id.* (quotation omitted) (citing *Syrovatka v. State*, 278 N.W.2d 558, 561-62 (Minn. 1979)). The four *Syrovatka* factors are not exclusive, and ultimately, the district court must perform "a balancing test between the defendant's right to prepare a defense and the public's interest in effective law enforcement." *Id.* "In rare cases a criminal defendant's interest in learning the identity of a

32

police informant outweighs the state's privilege not to disclose the identity." *State v. Moore*, 438 N.W.2d 101, 106 (Minn. 1989). "The defendant bears the burden of making a showing sufficient to require disclosure." *State v. Solheim*, 477 N.W.2d 785, 787 (Minn. App. 1991).

Hinton moved to compel disclosure of identifying information about the CRI. In the alternative, Hinton moved for disclosure of nonidentifying information "that goes to the veracity of the CRI" or an *in-camera* review of all information related to the CRI. The district court denied Hinton's requests.[7]

We first consider the district court's denial of Hinton's request for the CRI's identifying information. The district court determined that under the first two *Syrovatka* factors, "disclosure of the informant's identity is unwarranted because [Hinton] has not shown that the informant is a material witness or that the informant's testimony will be material to the issue of guilt." The district court noted that the charges "are not based on any [incident the CRI] previously observed . . . but on the firearm and narcotics that police discovered firsthand in [Hinton's] residence." Under the third *Syrovatka* factor, the district court determined that Hinton did not provide "sufficient indication that the testimony of the officers is suspect." The district court emphasized that the CRI provided accurate and reliable information in the past and that law enforcement "corroborated the informant's key information." The district court did not consider the last *Syrovatka* factor because Hinton did not "contend[] that the informant's testimony might disclose entrapment."

---

[7] On appeal, Hinton does not challenge the district court's denial of *in-camera* review.

33

In his brief to this court, Hinton argues that "[d]isclosure of the informant's identity" was "essential to Hinton's defense." Under the *Syrovatka* factors, Hinton first contends that "the informant was a material witness" because "the informant was the only potential witness to [Hinton's] actual possession of the firearm and drugs." The state argues that "the CRI was not present at the time the search warrant was executed and thus was not a witness to the crimes with which [Hinton] was charged."

The state's argument is persuasive. "[W]hen a trustworthy informant is a mere transmitter of information and not a competent witness to the crime itself . . . the informant's name need not be disclosed when the information was used as a basis for probable cause to search or arrest." *State v. Purdy*, 153 N.W.2d 254, 262 (Minn. 1967). For example, we determined that a defendant "did not make a sufficient showing of need for the disclosure of the informants' identity" where the charges "were based primarily [on the defendant's] possession" of contraband and "[t]he information supplied by the informants was only used to obtain the search warrants." *State v. Marshall*, 411 N.W.2d 276, 280 (Minn. App. 1987), *rev. denied* (Minn. Oct. 26, 1987); *see also State v. Ford*, 322 N.W.2d 611, 614 (Minn. 1982) (concluding that the defendant failed to show the need for disclosure of the CRI's identity when "the informant was not a witness to any of the events . . . on which the state relied in establishing defendant's guilt").

Hinton's charges were based on possession of a firearm, ammunition, and drugs found during a search of his apartment. The CRI was not a witness to the charged crimes. Rather, like the CRI in *Marshall*, the CRI here only supplied information used to obtain a

search warrant. Thus, the district court did not err by determining that the CRI was "not a material witness to the charged offenses" and was not "material to the issue of guilt."

Next, Hinton argues that under the third *Syrovatka* factor, "various statements in the warrant application were suspect" because the affidavit "provided no basis as to why the informant was reliable" and corroborated only "generic" information from the CRI. The state argues that Hinton is "reiterating the argument . . . that the warrant affidavit did not establish probable cause for the search of his residence, not showing that the statements made in the affidavit were suspect." Indeed, Hinton challenged the district court's probable-cause determination on the same grounds he raises here. Because, as detailed above, the search-warrant affidavit established the CRI's reliability and corroborated specific details from the CRI's tip, Hinton fails to show that the affidavit contained "suspect" statements. We conclude that Hinton has not met his burden to show that disclosure of the CRI's identity was required. Thus, the district court did not abuse its discretion by denying Hinton's motion to compel disclosure of identifying information about the CRI.

Second, we consider the district court's denial of Hinton's request for nonidentifying information related to the CRI's veracity. The district court based its denial on "the same reasons that [Hinton] is not entitled to the informant's identity" while also noting that defendants are "generally not entitled to impeachment information about individuals who will not testify at trial" and that "the informant is not a hearsay declarant whose credibility is at issue."

Hinton asserts that the district court abused its discretion by denying his request to compel disclosure of nonidentifying information because "no privilege attaches to the informant's non-identifying information." Hinton relies on United States Supreme Court caselaw that states, "[W]here the disclosure of the contents of a communication will not reveal the identity of [a CRI], the contents are not privileged." *Roviaro v. United States*, 353 U.S. 53, 60 (1957). Still, Hinton must prove that the disclosure of information about a CRI "is relevant and helpful to the defense . . . or is essential to a fair determination of a cause." *Id.* at 60-61; *accord Rambahal*, 751 N.W.2d at 90. As described above, Hinton fails to do so. Because Hinton does not make separate arguments as to why the CRI's nonidentifying information was essential to his defense, he likewise fails to show that the district court abused its discretion by denying disclosure of the CRI's nonidentifying information.

**Affirmed.**